Salvatore CALI and Genie Cali, Plaintiffs,

v.

DANEK MEDICAL, INC., Sofamor, Inc., Warsaw Orthopedic, Inc., National Medical Specialty, Inc., Stuart Medical Specialty, Inc., Stuart Medical, Inc., Eduardo Luque, Charles E. Johnston, II, Richard Ashman, Ph.D., Gary Lowery,

George Rapp, Ensor Transfeldt, John A. Herring, Thomas Whitecloud, III, Texas Scottish Rite Hospital for Crippled Children, American Academy of Orthopedic Surgeons, North American Spine Society, Scoliosis Research Society, Ace Medical Company, Advanced Spine Fixation Systems, Inc., Cross Medical Products, Depuy–Motech, Inc., Scientific Spinal, Smith & Nephew Richards, Inc., Synthes (U.S.A.), Synthes, Inc., Synthes North America, Inc., Synthes, A.G. Chur, Zimmer, Inc., Spinal Science Advancement Foundation, Sofamor, S.N.C., Sofamor, Inc., Stuart Drug and Surgical Supply, Inc., Youngwood Medical Specialties, Inc., Richard W. Treharne and Ermon R. Pickard, Defendants.

No. 95–C–753–S.

United States District Court, W.D. Wisconsin.

May 18, 1998.

Order Denying Motion to Amend Judgment, Aug. 7, 1998.

mossai.

John J. Cummings, III, Cummings, Cummins & Dudenhefer, New Orleans, LA, for Plaintiffs.

Thomas J. Arenz, Whyte Hirschboeck Dudek, S.C. Milwaukee, WI, for Defendants.

## MEMORANDUM AND ORDER

SHABAZ, Chief Judge.

Plaintiff Salvatore Cali (plaintiff) commenced this products liability, breach of warranty and fraud action against defendants Danek Medical, Inc., Sofamor Danek Group, Inc., Warsaw Orthopedic, Inc., S.N.C., Richard Treharne and Ermon Pickard (collectively the SNG Defendants) alleging that he was injured when defective orthopedic bone screw devices designed, manufactured and sold by the SNG Defendants were attached to his spine during spinal fusion operations. Plaintiff further alleges a conspiracy among manufacturers of spinal implants, doctors and medical societies to fraudulently promote the sale of spinal implant devices by conducting joint sales seminars for surgeons promoting the devices while concealing important information concerning the regulatory status, lack of research demonstrating the effectiveness and safety of the devices and the financial relationships between doctors promoting the devices and device manufacturers. Jurisdiction is based on 28 U.S.C. § 1332.

The matter was referred to the District Court for the Eastern District of Pennsylvania for purposes of multi-district pretrial litigation, MDL Docket No. 1014, and was returned to this Court after completion of discovery and resolution of non-case specific legal issues.

The matter is presently before the court on defendants' motions for summary judgment on all of plaintiffs' pending claims. Defendants American Academy of Orthopaedic Surgeons, North American Spine Society and Scoliosis Research Society (collectively Medical Society Defendants) have moved for summary judgment on the basis that any alleged undisclosed facts were immaterial, that there was no fraudulent intent by the Medical Society Defendants, that there is insufficient evidence of reliance or causation and that the conspiracy claims are barred by the applicable statute of limitations. The other defendants, including the SNG Defendants, have joined the motion of the Medical Society Defendants and have in addition moved for summary judgment for a number of reasons including insufficient evidence of their involvement in any agreement and lack of personal jurisdiction.

The SNG Defendants have moved separately for summary judgment on the nonconspiracy claims against them on the basis that the evidence is insufficient to establish a product defect, reliance on any misrepresentations or that the device designed, manufactured and sold by the SNG defendants caused harm to plaintiff.

## FACTS

Many of the following facts are undisputed. Where there is dispute the facts set forth are most favorable to the plaintiff.

On December 30, 1989 plaintiff fell from a truck and injured his spine aggravating a

preexisting degenerative spinal disc disease. Degenerative disc disease is the progressive deterioration of the intervertebral disc between the bodies of adjacent vertebrae. It can lead to pain. By early 1990 plaintiff was diagnosed with spondylolisthesis in his lumbar spine and severe lumbar spinal stenosis. Degenerative spondylolisthesis is the progressive forward displacement of one vertebra over another and spinal stenosis is narrowing of the spinal canal. Both can lead to pain. Notwithstanding his attempts to improve with conservative treatments including pain medications and physical therapy plaintiff's condition in his back and legs rapidly worsened to the point that in April 1990 he stopped working and was referred to and examined by an orthopedic specialist, Dr. Whiffen.

Whiffen obtained his medical degree from Harvard Medical School in 1971 and became board certified in orthopedic surgery in 1978. He has been in practice for over 17 years, averaging at least 100 major spinal fusions per year. He has used bone screw fixation in the pedicle over 500 times. He trained himself in the use of screws in the pedicle by practicing on cadavers at the University of Wisconsin Cadaver Lab and by reviewing articles and literature from both European and American spine surgeons. Whiffen was aware of the FDA's classification of orthopedic bone screws since at least 1989. He is aware that the risks associated with pedicle fixation instruments include nerve damage, device failure, the potential need to remove devices and unsatisfactory fusion.

Whiffin taught courses to surgeons in 1988 and 1989 at seminars organized by the North American Spine Society and the Scoliosis Research Society on pedicle fixation of the spine. The first such courses were conducted as a part of the alleged conspiracy. He is a coauthor of *The Textbook of Spinal Surgery*, Chapters 7 & 8, Spinal Stenosis and Spondylolisthesis. He has attended various certified continuing medical education seminars conferences and workshops sponsored by medical associations, universities and others. He has assumed that doctors whose names are associated with a device receive compensation or have a financial interest in the sale of the device. He testified that information about financial interest was irrelevant to his consideration of the appropriate form of care for his patients.

Whiffen concluded that lumbar laminectomy surgery would be appropriate for plaintiff in order to remove bone from the posterior lumbar spine in an effort to relieve stress on a neighboring nerve. Plaintiff elected to proceed with this surgery which was performed without instrumentation by Whiffen in June 1990. During this surgery the thick outer part of plaintiff's spinal cord, called the dura, was torn. Following this surgery plaintiff had continued stenosis and spondylolisthesis and degenerative changes from L3 to S1. Plaintiff further injured his back months later when attempting to lift from a swing his two-year-old son who weighed approximately 20–25 pounds.

Whiffen recommended instrumented fusion surgery to stabilize plaintiff's lower back. Spinal fusion surgery is a method of placing bone graft material between two mobile segments of the spine to knit them together as one bony unit and eliminate motion between the segments. Fusion surgery can be performed with or without the use of spinal instrumentation for internal fixation. With or without the aid of internal fixation instruments there is a risk that the fusion will not occur. The failure of fusion is referred to as pseudarthrosis. Furthermore, even if fusion is obtained there is a risk that pain symptoms might not be reduced.

Internal fixation instruments are used to provide temporary stability to decrease motion between segments of the spine to allow the bone fusion to knit together. Internal fixation devices act as an internal splint. If a solid fusion is obtained the device is no longer providing structural support and can be removed. If a solid fusion is not obtained at some point in time the internal fixation device will fail. Internal fixation devices may be attached with hooks, wires or bone screws. When the bone screws are employed they are screwed into the pedicles of neighboring vertebrae and connected to rods or plates to stabilize movement between the vertebrae to which they are connected.

Whiffen discussed with plaintiff the regulatory status of bone screws used for pedicle fixation. He informed plaintiff not to

expect to be able to return to work as a truck driver following the instrumented fusion surgery. Plaintiff elected to proceed with a two-level (L3–4 and L4–5) posterior lumbar fusion surgery which was performed by Whiffen in January 1991 and included the use of Danek's Plate and Screw System (the Luque System) where certain screw components were inserted into a portion of plaintiff's L3 to L5 vertebral pedicles. A very small tear of the dura occurred during the removal of scar tissue at L4–5, a procedure that took place in preparation for the instrumented fusion and did not involve the use of the Luque System. Marked subsequent improvement was noted in plaintiff's condition. Approximately ten days after the surgery his pain was "real tolerable" and he did not recall having any "real pain." At that point he felt that the surgery had definitely improved his condition. His pre-existing degenerative disc disease, including degenerative spondylolisthesis and stenosis, nonetheless continued to progress.

In one of his follow-up visits with Whiffen in the months following surgery plaintiff asked that the instrumentation be removed because he was concerned that its presence in his body would lead to problems. Whiffen agreed to do so, but only after a year had elapsed from the implant surgery to allow adequate time for the fusion to heal and solidify. On January 24, 1992, one year after implant, Whiffen surgically removed the instrumentation, including the bone screws.

At the time of his discharge from the hospital three days after this explant surgery plaintiff was able to walk. He soon progressed to walking almost three miles at a time, mowing his lawn, lifting his five-year-old son and fishing with his boys. Some pre-implant problems returned in June 1992 when plaintiff noticed a "clicking in his back". This was attributed by Whiffen to problems at a lumbar level upon which no operation had been performed (L1–2). In November 1992 plaintiff felt a "pop" in his back after which additional pre-implant symptoms returned and he developed extreme pain, keeping him bedridden.

Plaintiff thereafter elected to be treated at the University of Wisconsin Hospital in Madison where his degenerative problems were again attributed to a new lumbar level (L1–2)

and to another level (L2–3) that had been operated upon, but without instrumentation. In December 1992 to relieve pressure at L2–3 a spinal surgical procedure without instrumentation was performed by Dr. Bryson Smith, during which a large amount of scar tissue was found and removed between the larnina of L2–3, and scar tissue was also removed from old laminectomy sites at L2. Following this surgery plaintiff had another "pop" in his back leading to pain. At approximately the same time he felt a recurrence of his pre-implant weakness in his legs, and he has since continued to have difficulty with his legs.

In November 1993 a possible pseudarthrosis at one level (L4–5) was noted. At the same time a solid fusion was noted at L3–4 and instability was again noted at the never instrumented L2–3 level. Further fusion surgery was recommended by Dr. Thomas Zdeblick, an orthopedic surgeon at the University of Wisconsin Hospital. Zdeblick has performed 1200 spinal operations. He holds a scientific review position on both the American Academy of Orthopedic Surgeons and the North American Spine Association and as a result has reviewed numerous abstracts, both published and unpublished on the topic of pedicle screw spinal implants. He has conducted and published his own study on pedicle fixation devices. He has presented his views on pedicle implants to the FDA advisory panel on two occasions. He has spoken on the topic at numerous seminars and is compensated by the SNG defendants via royalties for the purchase of Zdeblick's anterior thoracolumbar plate system and for consulting fees.

On February 17, 1994 Zdeblick performed a multi-level fusion from L2–5 using a different internal fixation device manufactured and sold by the SDG defendants known as the TSRH System, which also included orthopedic bone screws. All records since his fifth surgery have confirmed that plaintiff has achieved a successful fusion from L2–5. His complaints of some lingering back pain and some residual lower extremity weakness have been attributed by his treating physicians to neuropathy, plaintiff's multiple surgeries themselves (as distinct from any de-

vices), and arachnoiditis. Arachnoiditis is an inflammation surrounding the lining of nerves in the spinal canal. It may be caused, *inter alia,* by infection, scarring from manipulation of the nerves, or bleeding at the time of surgery.

Notwithstanding a lack of evidence that pedicle screw fixation devices are safe or effective the medical device manufacturers named as defendants in this action retained a number of spine surgeons to act as their agents in an elaborate marketing campaign to endorse and promote the use of pedicle screw fixation devices. In exchange the physicians received stock in the manufacturers, stock options, retainer agreements, royalties and other remuneration which gave them a stake in the sale of the devices.

Many of these physicians also controlled and held leadership positions in the Medical Association Defendants. Consequently the Medical Association Defendants agreed, in exchange for millions of dollars to sponsor hundreds of seminars, conferences, meetings, courses and workshops where physicians were paid by manufacturers to teach other spine surgeons how to use their pedicle screw fixation devices. At the seminars no disclosure was made of the financial relationships between the manufacturers and presenters. Defendants also failed to disclose all the risks associated with use of the devices, the lack of scientific support for the safety and effectiveness of the devices, and the refusal of the FDA to approve device labeling for pedicle use. The effect of this conspiracy was to establish the use of pedicle screw fixation devices as the standard of care in spinal fusion surgery even though its safety and effectiveness had not been established.

Plaintiff offers two case specific experts, Drs. Mitchell and Levy, to provide medical evidence that the internal fixation instruments implanted on plaintiff's spine were defective and caused him injury. Their opinions are based on a partial review of plaintiff's medical records. Neither expert has personally interviewed or examined the plaintiff.

Mitchell is an orthopedic surgeon. He has no training in biomechanics, design or engineering of lumbar instrumentation. He has never implanted a spinal fixation device and has never treated a patient who had instrumented spinal fusion. He testified that pseudarthrosis occurs in ten to fifty percent of non-instrumented spinal fusion surgeries, depending on the number of levels being fused. He did not rely on any reports or studies on the ability of the Luque System to withstand loads or stresses nor did he rely on any medical articles, studies or periodicals. He has never seen or read reports on other patients implanted with the Luque System. He based his opinion exclusively on his own experience as an orthopedic surgeon.

Mitchell, after summarizing the medical records he reviewed, opines as follows:

> It would be my opinion, with a reasonable degree of medical certainty, that the Luque II System, which was inserted by Dr. Whiffin for the purpose of achieving a spinal fusion, failed in this purpose because of its system design, which was incapable of withstanding the loads, stresses and strains to which it was subject in the human body. It did not stabilize the spine and prevent motion and therefor a nonunion occurred.... It is, therefore, my opinion that as a result of its failure, another operation was necessitated for Mr. Calli and although he has obtained solid fusion after that operation, he still goes on to complain of neurologic problems in the lower extremities, as well as pain, requiring narcotics for the future.

Mitchell does not have enough information to form an opinion as to whether any of the plaintiff's neurologic problems have any relationship to plaintiff's instrumented fusion surgeries.

Dr. Levy, also a neurosurgeon, after reviewing the medical records opined as follows:

> Based on my own experience, I do not believe that Mr. Cali's significant neurological impairment in the lower extremities following two operations in which pedicle screw implantation was used ... is pure coincidence. In my opinion, there is probably either a direct or indirect cause and effect relationship between the pedicle screw implantation on the one hand and the residual neurological deficits in the lower extremities on the other.

Drs. Mitchell and Levy have not ruled out degenerative disc disease, spondylolisthesis, spinal stenosis, multiple back operations and associated trauma, arachnoiditis, peripheral neuropathy or polyneuropathy as causes of plaintiff's complaints.

Plaintiffs also identify as one of their generic trial experts Dr. John Esterhai. Esterhai has testified that in terms of the degree of immobilization or stability pseudarthrosis is never more likely with instrumentation than without.

## MEMORANDUM

The motions of the Medical Society Defendants and the SDG Defendants broadly address the two types of claims advanced by the plaintiffs. The Medical Society Defendants challenge the sufficiency of the evidence to support the elements of plaintiff's claim that he was injured by a conspiracy among all defendants to conceal certain facts relating to spinal fixation devices. The SDG motion challenges the sufficiency of the evidence to support the products liability, negligence and fraud claims against them. Other motions are addressed to facts specific to a particular defendant. The court finds it unnecessary to reach these more specific motions because it finds that the matter is subject to summary judgment in favor of the defendants on the broad challenges of the Medical Society and SDG defendants. Specifically, the evidence is insufficient as a matter of law to support a jury finding that plaintiff's surgeons were influenced by any misrepresentations of the alleged conspiracy to recommend that plaintiff undergo instrumented fusion surgery or that the use of an internal fixation device was the cause of any injury to the plaintiff.

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure.

A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A fac-

tual issue is genuine only if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Plaintiff has not come forth with sufficient evidence from which a reasonable jury could return a verdict in his favor.

*The Conspiracy Claims*

The initial task is to identify the nature of the conspiracy claim or claims being pursued by plaintiff. Plaintiff suggests that he is pursuing conspiracy claims not only for active concealment of information at the training seminars but also for fraud on the FDA and violation of FDA requirements and regulations. Defendants argue that the latter claim has been conclusively resolved in their favor by the MDL Court and is no longer viable as a matter of law.

Unquestionably the MDL court dismissed for failure to state a claim pursuant to rule 12(b)(6) plaintiff's claim for conspiracy to defraud the FDA or to violate FDA regulations:

> It follows that most states would not recognize a claim for civil conspiracy alleging that the object of the conspiracy was to violate a federal statute that did not provide for a private right of action. The United States Court of Appeals has held that there is no private right of action for violations of the FDCA.... The Court believes that this represents the rule that a substantial majority, if not all, of the states would follow. Therefore, plaintiff cannot state a conspiracy claim based solely on the notion that Defendants agreed to violate the FDCA.

\* \* \* \* \* \*

The [conspiracy] claim alleges two types of fraud. First, it alleges that the defendants actively concealed material facts at the seminars. Second, it alleges that the Intercompany/Association Conspirators submitted false information to the FDA. The court finds that the first category of fraud states a claim that is actionable under the

laws of most states, but the second does not.

PTO 861 at 25–26 (citations omitted). Accordingly, the Court granted defendants motion to dismiss the claim based on violation of the FDCA and fraud on the FDA. The court defined the remaining claim as follows:

> Accordingly, Plaintiffs are left with a slimmer Intercompany/Association Conspiracy, comprising only the agreement to promote a Class III device without FDA approval by unlawful means (actively concealing material facts at the association sponsored seminars/sales events).

*Id.* at 29. This is the conspiracy claim remaining in the case. Plaintiff has advanced no motion to reconsider the prior dismissal and therefore remains bound by it. *Allegheny Airlines, Inc. v. LeMay,* 448 F.2d 1341, 1345 (7th Cir.1971).

▆▆ In order to succeed on the remaining conspiracy claim under Wisconsin law plaintiff must demonstrate a concerted action to accomplish an unlawful purpose. *Anderson v. Regents of University of California,* 203 Wis.2d 469, 554 N.W.2d 509, 518 (Ct.App.1996). In this case plaintiff must prove concerted action to defraud surgeons to use pedicle implant devices by actively concealing relevant facts from them. It is not enough, however, to prove the mere existence of a conspiracy:

> A conspiracy may produce one or more torts. If it does, then every conspirator is liable for that tort, including a conspirator who promoted but did not commit the tort. A conspiracy is not, itself, a tort. It is the tort, and each tort, not the conspiracy, that is actionable.

*Segall v. Hurwitz,* 114 Wis.2d 471, 481, 339 N.W.2d 333 (Ct.App.1983). Accordingly, plaintiff must also establish all elements of the underlying misrepresentation claim as applied to him.

▆▆ A cause of action for misrepresentation, whether intentional or negligent, contains the following three elements: 1) the representation must be of a fact and made by the defendant; 2) the representation of fact must be untrue; and 3) plaintiff must believe such representation to be true and rely thereon to his damage. *Whipp v. Iverson,* 43 Wis.2d 166, 169, 168 N.W.2d 201 (1969). To state a claim for intentional misrepresentation plaintiff must prove that the defendant knew the representation was untrue or made it recklessly without caring whether it was true or false and with the intent to deceive the plaintiff. *Id.*

▆▆ Silence or the failure to disclose a fact is treated in law as the equivalent of the representation of the non-existence of a fact if the party was under a duty to disclose it. *Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 26, 288 N.W.2d 95 (1980). A party to a business transaction is under a duty to disclose facts basic to the transaction where the other party would reasonably expect a disclosure of those facts. *Id.* (citing Restatement (Second) Torts § 551 (1977)). Plaintiff is required to prove these elements by clear and convincing evidence. *Lundin v. Shimanski,* 124 Wis.2d 175, 184, 368 N.W.2d 676, 680 (1985).

Assuming plaintiff could demonstrate concerted action to intentionally conceal information from surgeons at the seminars thereby satisfying the first two elements of a claim for conspiracy to defraud, there is absolutely no support in the record to support the third element of a fraud claim—detrimental reliance by plaintiff on the concealment. Specifically, there is no evidence, much less clear and convincing evidence, from which a reasonable factfinder could conclude that plaintiff's surgeons, Whiffin and Zdeblick, were influenced by any non-disclosures at seminars in their decisions to recommend instrumented fusion for plaintiff.

Whiffin has performed over five hundred pedicle screw fixation procedures and one hundred major spinal fusions per year. He is co-author of a textbook on spinal surgery. He learned the spinal fusion implant procedure by independently reviewing articles and literature from European and American spine surgeons and practicing on cadavers at the University of Wisconsin. He taught courses on pedicle fixation to other spine surgeons at seminars in 1988 and 1989. He has been aware of the FDA regulatory status of pedicle screws and advised the plaintiff of that status prior to conducting the operation in question. He was generally aware, but unconcerned, that surgeons whose names are

associated with medical devices have a financial interest in their sale.

Under all these circumstances it is incredible to suggest that Whiffin recommended spinal fusion surgery with instrumentation because he was misled at the very seminars where he taught. He was clearly aware of those facts which were allegedly omitted and in any event was relying upon his independent knowledge and experience, not on any misinformation received at the seminars, when he recommended instrumented spinal fusion for plaintiff. There is no evidence from which a reasonable jury could conclude otherwise.

The same conclusion is compelled for Dr. Zdeblick. Zdeblick is an expert in the field of pedicle screw fixation devices, having conducted and published his own scientific study on the topic. He is aware of the FDA status of pedicle screws and has addressed the FDA on the topic. He is surely aware that seminar speakers receive compensation as he is such a speaker and does receive compensation. It is absurd to suggest that Zdeblick was defrauded by reliance on misinformation he received at seminars in which defendants were involved.

As a matter of law neither of plaintiff's surgeons relied on or were deceived by defendants' alleged conspiracy. Both were independently aware of the FDA status of pedicle screw devices, the existence of compensation of doctors by device manufacturers and the risks and benefits of pedicle screw fusion surgery. To the extent the surgeons failed to adequately inform plaintiff of the risks of the surgery it was unrelated to any reliance on seminar misinformation and therefore unconnected to the alleged conspiracy.

▮ Plaintiff's conspiracy claims also fail for the independent reason that there is no admissible evidence that plaintiff's back injury was in any way caused by the use of instrumentation during the fusion operations. Even if plaintiff could demonstrate (which he has not) that his surgeons were duped into using implant devices in surgery he can not prevail unless he can demonstrate that he was damaged as a result of their reliance in recommending instrumented surgery.

*The Products Liability Claims*

An essential element of each claim of plaintiff is that the implantation of defendants' spinal implant devices caused him injury. Indeed, the multi-district litigation court ordered that no plaintiff could proceed without identification of a case specific expert to support injury and cause:

> In PTO 764 the court required each plaintiff to identify at least one duly qualified medical expert who would provide an opinion supporting the plaintiff's claim that an *injury* has occurred and a *cause* of that injury was a defendant's product or conduct. It was the transferee court's view that this requirement would assure that there was a sound basis for the plaintiff's claim much like the requirements of parties under the standards governing Fed. R.Civ.P. 11 assuring that there be evidentiary support for a position taken by a party before the court. The plaintiff is required to identify and provide a report for such an expert identification and report prior to remand and the defendant is required to respond with a similar expert prior to remand.

PTO 1235 at 16.

▮ This requirement is consistent with Wisconsin law. To establish liability a plaintiff must prove not only that the defendant's product was defective, that its properties were misrepresented or that a warranty was breached, but also that the product was a cause in fact of plaintiff's injury.

> "Causation is a fact; the existence of causation is an inference to be drawn from the circumstances by the trier of fact." Nonetheless, "the lack of expert testimony on the question of causation results in an insufficiency of proof where the issue involves technical, scientific or medical matters which are beyond the common knowledge or experience of jurors and the jury could only speculate as to what inference to draw."

*Ollman v. Wisconsin Health Care Liability Ins. Plan,* 178 Wis.2d 648, 667, 505 N.W.2d 399 (Ct.App.1993). Undoubtedly, this is a case which requires medical testimony to establish causation between the device and plaintiff's injury.

In an effort to meet its burden of proof on causation plaintiff has identified two case specific expert witnesses, Mitchell and Levy. However, the reports and deposition testimony of these witnesses are clearly insufficient to create a genuine issue of fact on the question of causation. To be admissible expert testimony on scientific or medical matters must satisfy the two-prong requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the testimony must be reliable in the sense that it is supported by an appropriate scientific basis. *Cummins v. Lyle Industries*, 93 F.3d 362, 368–69 (7th Cir.1996). Second, it must be relevant—the scientific testimony must "fit" the fact issue in the case. *Id.* at 370. The testimony of neither Michell nor Levy satisfies either prong.

Mitchell's only opinion relevant to cause is that the Luque system implanted by Whiffin was defectively designed to be incapable of bearing the "loads, stresses and strains to which it was subject" and therefore caused plaintiff's pseudarthrosis necessitating a second surgery. Mitchell's report provides no scientific basis for this opinion and his deposition testimony establishes that he has none. In order to have a scientific basis sufficient for admissibility an expert opinion must be grounded in scientific methods and procedures and cannot be mere subjective belief or unsupported speculation. *Id.* at 368. Mitchell's opinion is precisely the latter. He admits to having no personal knowledge, training or experience in medical instrument design or engineering. Neither has he consulted any reports or studies of others in reaching his conclusion. He has not even treated patients with implants. In short, he has absolutely no scientific basis which would render his opinion reliable.

Furthermore, his opinion is flatly contradicted by one of plaintiff's non-case specific experts, Esterhai, who opines that in the absence of infection or some other secondary problem spinal implants never make pseudarthrosis more likely than in uninstrumented fusion. It is undisputed that pseudarthrosis occurs in a significant number of fusion surgeries, whether instrumented or uninstrumented. Mitchell's attribution of pseudarthrosis to the Luque system is nothing but speculation. His testimony provides no admissible support for a finding that the Luque system caused injury to plaintiff.

Levy's testimony can clear neither of the *Daubert* hurdles as it is not scientifically reliable and it does not fit the plaintiff's claims. The opinion itself is obviously unsupported speculation. Levy simply asserts that since there was instrumented fusion followed by neurological deficits the former is "probably either a direct or indirect cause" of the latter. Such a conclusion without any support is not one based on expert knowledge and is not entitled to the dignity of evidence. *Navarro v. Fuji Heavy Industries, Ltd.*, 117 F.3d 1027, 1031 (7th Cir.1997). In fact, it is undisputed that Levy has not ruled out disc disease, spondylolisthesis, stenosis, multiple operations, arachnoiditis peripheral neuropathy or polyneuropathy as causes of plaintiff's present complaints. Under circumstances where symptoms may be the subject of a variety of causes it is insufficient for an expert to opine as to the cause of the symptom without some scientific basis other than his assertion of general experience. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106–1107 (7th Cir.1994).

Neither does Levy's testimony fit the cause issue in this case. His report identifies specifically a dural tear incurred during the first implant surgery and arachnoiditis following the second as the likely causes of neurological deficits. However, the facts establish that the dural tears which plaintiff suffered were not incurred in connection with the implant of the device and therefore cannot be attributed to any defect in the device. Similarly, there is no attempt in Levy's report to offer any scientific basis to connect arachnoiditis to the use of pedicle screws.

The undisputed medical records and all medical opinions contained therein suggest that plaintiff benefitted significantly from both instrumented fusion surgeries but that the progression of his underlying disease caused a recurrence of symptoms. Plaintiff's expert testimony does not contradict this basic proposition and amounts to nothing more than conclusory speculation that the mere fact of pedicle screw use somehow proves a

952

connection to subsequent pain. An invitation to the jury to join in speculation is not sufficient medical causation testimony to defeat a summary judgment challenge.

## CONCLUSION

Plaintiff has not provided sufficient admissible evidence to permit a reasonable jury to conclude that his surgeons' recommendations of instrumented fusion surgery were affected by any concealment at defendants' seminars. Neither has he provided any admissible evidence from which a reasonable jury could conclude that the Luque or TSRH Systems implanted on his spine were the cause of any injury to him. Since these propositions are essential elements of all plaintiff's claims, summary judgment is granted in favor of all defendants. Resolution in defendants' favor of these fundamental issues makes it unnecessary to address the numerous arguments and motions directed to other defenses and to alleged failures of proof regarding facts specific to particular defendants. Plaintiff Genie Cali's claim for loss of consortium, being derivative of her husband's claims, must also be dismissed.

## ORDER

IT IS ORDERED that the motions of defendants for summary judgment on all claims is GRANTED.

IT IS FURTHER ORDERED that judgment be entered in favor of defendants dismissing plaintiffs complaint and all claims contained therein with prejudice and costs.

## MEMORANDUM AND ORDER

Plaintiff Salvatore Cali (plaintiff) and his wife Genie Cali commenced this products liability, breach of warranty and fraud action against the defendants Danek Medical, Inc, Sofamor Danek Group, Inc., Warsaw Orthopedic, Inc., Sofamor, S.N.C., Richard Treharne and Ermon Pick (collectively the SNG Defendants) alleging that plaintiff was injured when defective orthopedic bone screw devices designed, manufactured and sold by the SNG defendants were attached to his spine during spinal fusion operations. Plaintiff further alleges a conspiracy among manufacturers of spinal implants, doctors and medical societies to fraudulently promote the sale of spinal implant devices by conducting joint sales seminars for surgeons promoting the devices while concealing important information concerning the regulatory status, lack of research demonstrating the effectiveness and safety of the devices, and the financial relationships between doctors promoting the devices and device manufacturers. Jurisdiction is based on 28 U.S.C. § 1332.

The matter was referred to the District Court for the Eastern District of Pennsylvania for purposes of multi-district pretrial litigation, MDL Docket No. 1014, and was returned to this Court after completion of discovery and resolution of non-case specific legal issues. On May 18, 1998 this Court granted summary judgment in favor of all defendants dismissing all claims for plaintiff's failure to produce sufficient evidence that a pedicle screw device caused him injury and separately finding that plaintiff failed to establish the reliance element necessary for a conspiracy claim based on fraud. The matter is presently before the Court on plaintiff's motion to alter or amend the judgment pursuant to Rule 59(e). Plaintiff asserts that the Court erred in its assessment of the causation evidence and misinterpreted the nature of his conspiracy claims.

## MEMORANDUM

Proof that the pedicle screw device was the cause of an injury to plaintiff is essential to each of plaintiff's claims. Accordingly, the court considers first plaintiff's challenge to the finding that evidence of cause was inadequate as a matter of law.

*Causation*

In its original opinion the Court rejected the evidence of both Dr. Mitchell and Dr. Levy as being insufficient as a matter of law to supply the expert testimony necessary to support a finding that pedicle screw implants caused plaintiff's injury. Nothing in plaintiff's new submissions suggests that this conclusion was incorrect. In fact, plaintiff's argument largely ignores the fundamental reasons for the Court's conclusion.

Concerning Dr. Mitchell, plaintiff notes that he has 35 years of experience as a orthopedic surgeon and reviewed the medical

records of the plaintiff. This combination of experience and review, suggests plaintiff, is sufficient to support Mitchell's opinion that defects in the spinal implant caused pseudarthrosis in the plaintiff. Plaintiff ignores the undisputed fact that virtually none of Dr. Mitchell's experience involves spinal implants and he has no training or experience and has not even read the research of others on the primary basis for his opinion—the ability of the implant to bear the stress of the human back. In short, while Dr. Mitchell has significant experience and training in the area of uninstrumented spinal surgery he has no experience or training in the area in which his opinion is offered. His testimony on the load bearing characteristics of the spinal implant is inadmissible unscientific speculation. *See Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996). Plaintiff also ignores the fact that Dr. Mitchell's baseless opinion is flatly contradicted by the opinion of its other expert, Esterhai, who rules out spinal implants as a cause of pseudarthrosis. There is no basis to reconsider the previous rejection of Dr. Mitchell's testimony.

■ Dr. Levy's testimony was originally rejected as both speculative and irrelevant. Specifically, it was noted that it was irrelevant because there was no basis in the opinion to connect the causes of pain identified by Dr. Levy, dural tears and arachnoiditis, to the spinal implant. Plaintiff's motion to reconsider does not even mention these issues. Rather plaintiff merely overstates the degree of medical record review performed by Dr. Levy and suggests that it was sufficient to support the opinion. The opinion itself, which was never presented in appropriate evidentiary form, reveals its speculative nature. It provides no basis for the conclusion that the plaintiff's first spinal implant caused neurological impairment. It merely offers the conclusory opinion that the implant and the impairment are not "pure coincidence".

The Court finds no basis to reconsider its prior ruling concerning the inadmissibility and insufficiency of plaintiff's proffered expert testimony to support a finding of causation. Accordingly, none of plaintiff's claims can survive summary judgment.

*Conspiracy*

Assuming plaintiff could establish causation, which he has not, the Court would not reconsider its previous conclusion that plaintiff's conspiracy claims fail as a matter of law for independent reasons. Plaintiff's motion to alter or amend the judgment does not challenge the Court's previous conclusion that there is insufficient evidence that plaintiff's doctors relied on any misinformation disseminated at the seminars. Instead, plaintiff seeks to resurrect the claim of conspiracy to violate FDA requirements which was rejected by the Multi–District Court and to reconfigure its misrepresentation claim to a claim that plaintiff's doctors conspired with the defendants to deceive him about internal fixation devices. Neither of these claims has merit.

Concerning the alleged conspiracy to violate FDA regulations, plaintiff argues that the MDL Court left open the claim and suggests that regardless of any ruling by the MDL Court, this Court has authority to reconsider a ruling that no cause of action exists under Wisconsin law. Assuming that it would be appropriate to reconsider the MDL Court's rejection of the claim upon a proper motion, there is no legal basis to do so because the MDL Court properly concluded that Wisconsin would not recognize it.

■ Wisconsin recognizes claims for civil conspiracy only to the extent that the conspiracy has resulted in the commission of an actionable tort. *Segall v. Hurwitz*, 114 Wis.2d 471, 481, 339 N.W.2d 333 (Ct.App. 1983). Accordingly, to sustain a claim under Wisconsin law for conspiracy to violate FDA regulations such violation would have to support a claim for negligence per se. Plaintiff is correct that the FDCA would not preempt such a claim if it was recognized under Wisconsin law. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Wisconsin, however, as the MDL Court correctly concluded, would not recognize such a negligence per se claim based upon violation of FDA regulations.

For the violation of a safety statute to constitute negligence per se, a plaintiff must show: (1) the harm inflicted was the type the statute was intended to prevent;

(2) the person injured was within the class of persons intended to be protected; and (3) there is some expression of legislative intent that the statute become a basis for civil liability.

*Tatur v. Solsrud,* 174 Wis.2d 735, 743, 498 N.W.2d 232 (1993). The same analysis applies regardless of whether the statute is state or federal. *Olson v. Ratzel,* 89 Wis.2d 227, 246, 278 N.W.2d 238 (Ct.App.1979). Ignoring that plaintiff cannot establish the first element because he cannot prove cause, it is apparent that the third element is also absent.

 Far from containing an expression that FDA regulations are intended to form the basis for civil liability, the law expresses the opposite intention. Violations of the FDA are enforceable only by the United States. 21 U.S.C. § 337(a). There is no explicit private right of action and no suggestion that the act creates an implied private right of action. *Medtronic,* 518 U.S. at 487, 116 S.Ct. 2240. Under circumstances where Congress evidences no intention to create a private standard of care negligence per se cannot be based on the statute. *Olson,* 89 Wis.2d at 249–50, 278 N.W.2d 238; *Tatur,* 174 Wis.2d at 744, 498 N.W.2d 232.

 Plaintiff notes that the Seventh Circuit permitted a negligence per se action based on federal air safety regulations even though the federal statute provided for no private cause of action. *Bowen v. United States,* 570 F.2d 1311 (1978) (applying Indiana law). In *Bowen,* however, the Indiana legislature had expressly adopted the regulations as the state standard of care. *Id.* at 1319. There is nothing to suggest that the Wisconsin legislature has done the same with the federal regulations at issue here. There is no Wisconsin cause of action for negligence per se based upon the FDA regulations limiting promotion of medical devices.

Neither is there a viable claim for a conspiracy between plaintiff's doctors and the defendants to defraud plaintiff. There is no question that the only claim to survive the 12(b)(6) motion before the MDL Court was the claim that surgeons were defrauded by actions at the jointly sponsored seminars. No claim was advanced or pursued on the basis of fraud by the unnamed surgeons on their patients in conspiracy with the defendants. Indeed, plaintiff expressly disavowed such a theory both before the MDL Court and the Third Circuit Court of Appeals. June 24, 1996 Transcript of Hearing at pages 123–126 (representing that reliance by the plaintiff is irrelevant); September 23, 1997 Transcript of oral argument before the Third Circuit at page 96 (representing that reliance by doctors is the only relevant issue in the case). More fundamentally, there is no evidence that plaintiff's surgeons conspired with any defendants to defraud the plaintiff or that the defendants influenced the surgeons' decision concerning the information to be provided to their patients.

*Motion for Sanctions*

 Defendants' motion for Rule 11 sanctions fails as a matter of form, defendants having failed to make a separate motion or serve notice as required by Rule 11(c). Defendants attempt to circumvent the requirements by characterizing the request for sanctions as one under Rule 11(c)(1)(B) "on Court's initiative" is clearly inappropriate. Reality is that the motion was initiated by defendants as part of their opposition briefs, not by the Court. Permitting such a motion to be converted to a motion by the Court would eliminate the express requirements of the rule. Any request for Rule 11 sanctions by a party must comply with the requirements of Rule 11(c)(1)(A).

 The plaintiff's motion to reconsider does not justify the award of fees under 28 U.S.C. § 1927. Section 1927 permits the recovery of attorneys fees when an attorney unreasonably and vexatiously multiplies proceedings. Recovery under § 1927 is available when an attorney has:

acted in an objectively unreasonable manner by engaging in a "serious and studied disregard for the orderly process of justice ... or where a claim is without a plausible legal or factual basis and lacking in justification.

*Pacific Dunlop Holdings, Inc. v. Barosh,* 22 F.3d 113, 119 (7th Cir.1994) (quoting *Walter v. Fiorenzo,* 840 F.2d 427, 433 (7th Cir.1988)). Although the Court has rejected plaintiff's motion as not presenting persuasive new argument, nevertheless the motion involved is-

sues which are subject to legitimate legal argument and had a plausible legal and factual basis.

### ORDER

IT IS ORDERED that plaintiff's motion to alter or amend judgment pursuant to rule 59(e) is DENIED.

IT IS FURTHER ORDERED that defendants' motion to impose sanctions pursuant to Rule 11 or 28 U.S.C. § 1927 is DENIED.