Victoria L. **VALENTE,** Ralph Abagian, and Brenda L. **Moorer, Plaintiffs,**

v.

**SOFAMOR, S.N.C., et al., Defendants.**

No. 96–C–1327.

United States District Court, E.D. Wisconsin.

April 29, 1999.

Ronald S. Goldser, Keelyn M. Friesen, Zimmerman Reed, Minneapolis, MN, for plaintiffs.

Thomas Arenz, K. Michael Cooley, Whyte Hirschboeck Dudek, Milwaukee, WI, for defendants.

### DECISION AND ORDER

GOODSTEIN, United States Magistrate Judge.

The plaintiffs, who received orthopedic bone screws in the course of spinal surgery, bring this action against the follow-

ing bone screw designers, manufacturers, promoters, distributors and sellers—Sofamor, S.N.C; Sofamor Danek Group, Incorporated; and Danek Medical, Incorporated—alleging that the defendants' bone screws were defective and caused the plaintiffs to sustain injuries. This case is one of many filed across the United States against bone screw designers, manufacturers, promoters, distributors, and sellers and was transferred for consolidated pretrial proceedings on February 21, 1997, to the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407. The case was then returned to this court for further proceedings on February 12, 1998.

The claims of plaintiffs Valente and Moorer are for strict liability, negligence, fraud, violation of § 100.18, Wis.Stats., intentional concealment, negligent infliction of emotional distress, negligence per se, false advertising, and conspiracy to prevent public awareness of the hazards posed by bone screw devices. Plaintiff Ralph Abagian claims he has suffered a loss of consortium as a result of the injuries sustained by his spouse Victoria Abagian, now Valente. The plaintiffs dismissed all claims against Biedermann Motech GmbH; Falcom Med., Inc.; Dupuy Motech Inc.; Dupuy Dupont Orthopaedics; Dupuy, Inc.; Boehringer Manheim GmbH; Smith & Nephew; Richards Inc.; Smith & Nephew Consolidated, Inc.; Smith & Nephew, Inc.; Acromed Corp.; Scientific Spinal Ltd.; and Advanced Spine. The plaintiffs' claims against Artifex, Ltd., were dismissed by the multi-district litigation panel.

The parties have consented to this court's full jurisdiction. *See* 28 U.S.C. § 636(c)(1). Jurisdiction is proper based upon the existence of diverse parties and the proper amount in controversy. *See* 28 U.S.C. § 1332(a)(1). Venue is proper in the Eastern District of Wisconsin. *See* 28 U.S.C. § 1391(a). The parties agreed that the claims of the plaintiffs be severed for trial. A jury trial for plaintiffs Valente and Abagian is scheduled to commence on

May 17, 1999, and the trial for Brenda Moorer is set for August 16, 1999. Currently pending are the defendants' motion for summary judgment regarding both the Valente and Moorer claims, the defendants' motion to exclude the plaintiffs' expert witnesses from testifying at trial, and the defendants' motion for leave to file an amended answer. The court notes that the caption of this case has been changed to reflect the fact that plaintiff Victoria L. Abagian is now known as Victoria L. Valente.

## I. MOTION FOR SUMMARY JUDGMENT

### A. BACKGROUND

Based upon a review of the parties' submissions, the following facts are undisputed for purposes of the defendants' motion for summary judgment. More detailed factual analysis will be provided as it arises during the court's discussion of the parties' respective arguments.

### 1. Pedicle Screws: A Brief Overview

Spinal fusion surgery is a procedure whereby bone graft material is placed between two mobile vertebrae in order to create one immobile mass, thereby decreasing or eliminating the pain caused by vertebrae moving in different directions. A device known as the Cotrel–Dubousset system ("CD system") was designed by Sofamor to facilitate spinal fusion surgery. The CD system calls for two stainless steel rods to be inserted parallel to the spine and attached to the two vertebrae that are to be fused. Once a solid fusion is achieved, the device is no longer necessary and may be removed. Three means are available for attaching the rods to the spine—hooks over the lamina, wires under the lamina, or screws in the pedicles extending into the anterior vertebral body (also known as "bone screws"). It is the bone screw device that is the subject of this litigation.

## 2. Regulatory History

Under the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act ("FDCA"), medical devices intended for human use are classified as Class I, II, or III devices. Class I devices are considered to present the least risk to human safety and are subject to "general controls;" Class II devices present more risks to human safety than Class I devices and are subject to special controls; and Class III devices present the most risk to human safety and are subject to "premarket approval," which is designed to provide a "reasonable assurance of ... safety and effectiveness" for the most dangerous medical devices. *See* 21 U.S.C. §§ 360c(a)(1)(C), 360e(e) and 360i(a). Premarket approval under the MDA requires applicants to submit an application detailing: 1) extensive safety testing data; 2) the contents and operation of the device; 3) a description of methods used to manufacture, process, package, and install the device; 4) samples of the device; 5) proposed labeling for the device; and 6) all other information requested by the FDCA. 21 U.S.C. § 360e(c)(1). Once the device is approved, the Federal Food and Drug Administration ("FDA") regulations prohibit the device from being manufactured, packaged, stored, labeled, distributed, or advertised in a manner inconsistent with the conditions of approval. 21 C.F.R. § 814.80. The FDA retains the power to monitor the device and withdraw approval if the device becomes unsafe. 21 U.S.C. §§ 360e(e)(1)–(3) and 360(I).

During the period in which the plaintiffs underwent spinal fusion surgery, the pedicle screw device was classified as a Class III device and was not approved by the FDA for implanting into the pedicle region. However, the screws used in the plaintiffs' surgeries were marketed, labeled, and sold pursuant to a 1987 clearance letter issued by the FDA. The plaintiffs allege that because the pedicle screw device was not approved by the FDA for implantation into the vertebral pedicle, the defendants had a duty not to commercially market the devices for spinal usage and to regulate the use of the devices in hospitals. Moreover, the plaintiffs allege that pedicle screw devices were misbranded, improperly labeled, and marketed for a use for which they were not FDA approved.

## 3. Victoria Valente

Plaintiff Victoria Valente injured her back in 1988 and was diagnosed with lumbar myofascial pain syndrome in 1990. Lumbar myofascial pain syndrome is caused by chronic injury to the muscle and tissue surrounding the lower back (lumbar). Between 1988 and 1992, Ms. Valente consulted seven doctors for treatment or advice regarding her back pain and was prescribed analgesics, anti-inflammatory medication, muscle relaxant medication, narcotic medication, physical therapy, exercise, a corset, TENS, ultrasound, heat treatment, biofeedback and massage.

In March 1992, Ms. Valente was referred to Dr. Joseph Cusick, who discovered that Valente suffered from spondylolisthesis, a condition in which the lower lumbar vertebra moves forward and impacts upon the vertebra beneath it. The impact of one vertebra rubbing against another vertebra causes pain. Dr. Cusick advised Valente that her options were to live with her pain or consider surgery. The plaintiff states that Dr. Cusick told her that surgery would restore 90 to 95 percent of her back mobility. Dr. Cusick recommended that, if surgery were chosen, a posterior fusion should be conducted to connect vertebra L5 to vertebra S1 using rods and bone screws. Valente received a second opinion from Dr. James Flesch, who recommended a fusion operation without use of bone screws and rods. Dr. Flesch explained to Valente that fusion with bone screws and rods would provide more immediate short-term relief, but that such techniques present a higher risk of infection and urological problems. Valente followed Dr. Cusick's recommendation and underwent a fusion operation

with bone screws and rods on April 24, 1992.

As part of the fusion operation, bone graft was removed from the plaintiff's right iliac crest and the bone screws were placed in the pedicles of vertebrae L5 and S1. The rods were connected to the screws from L5 to S1 and bone graft was placed from L5 to S1 to create fusion. Following the surgery, Valente reported pain radiating into her left leg, although x-rays and CT scans did not show a problem with placement of the rods or bone screws. Shortly after surgery, on May 4, 1992, Dr. Cusick removed two bone screws and the rod from the left side of Valente's spine, but the bone screws and rod on the right remained. Dr. Cusick was not able to determine whether the bone screws or rod caused the plaintiff to experience the pain radiating into her leg. However, Dr. Cusick's report indicates that the pedicle screws were misplaced. The plaintiff alleges that the screws were misplaced due to defective design.

In November 1992, Valente slipped and fell on a bathroom floor, which required hospital treatment. In January 1993, Valente complained to Dr. Cusick of pain in the low back over the area of the S1 bone screw. On April 2, 1993, a third surgery was performed wherein Dr. Cusick removed the remaining bone screws and rod. The fusion mass was intact and firm.

Valente states that despite three surgeries, she continues to experience chronic pain in her back. According to the plaintiff's expert witness, Dr. Steven Trobiani, Valente's condition is most likely, at least in part, consequent to the screws and rods inserted during the April 1992 surgery, which has caused soft tissue inflammatory reaction, scarring of fascia, and a permanent post-surgical myofascial pain syndrome. Dr. Trobiani also states that the pain Valente experiences in her left leg is caused by an injury to the L5 vertebra, which Trobiani opines was caused by a defectively designed bone screw.

### 4. Brenda Moorer

Plaintiff Brenda Moorer began experiencing chronic low back pain in 1990 and was treated with physical therapy, bed rest, heating pads, ultrasound and TENS, anti-inflammatory medication, lifting restrictions and epidural steroid injections. In the autumn of 1990, Moorer consulted Dr. Sanford Larson, a neurosurgeon who concentrates on spine surgery. Dr. Larson diagnosed Moorer with retrolisthesis—abnormal motion in the spine. Dr. Larson suggested fusing the displaced spinal segments through use of a pedicle screw device. Moorer elected to proceed with the fusion operation and signed a consent form. The operation was performed on November 8, 1990. As part of the operation, pedicle screws were placed in the pedicles at vertebrae L5 and S1 and rods were attached to each side of the spine.

In September 1991, Ms. Moorer was a passenger on a bus involved in an accident. Dr. Larson's notes state that she had increasing back pain and a new lower right pain. A radiographic report dated November 15, 1991, states that there was no evidence that the devices implanted during her spinal fusion surgery became misaligned as a result of her accident.

Dr. Larson diagnosed Moorer with retrolisthesis of vertebrae L4 and L5 and recommended a second fusion operation at this level, which was performed on May 22, 1992. As part of the operation, Dr. Larson removed the rods and pedicle screws from the first operation and placed new rods and screws at L4 and L5. Dr. Larson's July 1992 notes indicate that Moorer had almost complete relief, but Moorer claims her pain increased. On March 31, 1993, Moorer was injured in an automobile accident, although x-rays did not show damage to the spinal fusion.

Moorer states that her lower back pain increased following her second surgery, which occasionally required her to use a cane. According to Dr. Trobiani, Moorer suffers from lumbar myofascial pain syn-

drome, which is manifest by pain, spasm, and postural distortion in the lumbar region. Dr. Trobiani states that such injuries were most likely caused by the "hardware" used during Moorer's spinal fusion operation.

## B. ANALYSIS

As mentioned above, the plaintiffs assert the following claims against the defendants: · 1) strict liability, 2) negligence, 3) fraud, 4) violation of § 100.18, Wis.Stats., 5) intentional concealment, 6) negligent infliction of emotional distress, 7) and "other causes of action," including negligence per se and conspiracy to prevent public awareness of the dangers of internal spinal fixation devices. The defendants argue that they are entitled to summary judgment on each claim.

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[M]aterial" facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute over such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The movant bears the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548 (the moving party has the responsibility of informing the court of portions of the record or affidavits

that demonstrate the absence of a triable issue). In addition, the moving party may meet its burden to show an absence of a material issue by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505; *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988); *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 886 (7th Cir.1989). If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. *Matsushita Elec. Inus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 1. Causation

#### a. Victoria Valente

Since the claims of plaintiff Ralph Abagian stem from the injuries allegedly sustained by Victoria Valente, for purposes of the court's discussion, only Valente's and Moorer's claims will be analyzed. The defendants' first ground for summary judgment is that the expert evidence upon which plaintiffs Valente and Moorer rely is insufficient to raise a factual dispute regarding whether a defect in the bone screw devices caused the plaintiffs to incur additional back injuries or experience further pain. The defendants argue that the plaintiffs' inability to present a prima facie case of causation is fatal to all of the plaintiffs' claims.

■ For the plaintiffs to establish liability, they must prove that the defendants' product was defective and that the product caused the plaintiffs' injuries, because causation is a necessary element for each of the plaintiff's claims. Moreover, the plaintiffs must present expert testimony establishing causation between their injuries and defects in the pedicle screw system.

See Smith v. Sofamor, S.N.C., 21 F.Supp.2d 918, 921 (W.D.Wis.1998). As Judge John Shabaz observed, "it is not enough to show that the fusion surgery caused the injury since the plaintiff and his doctors, not the defendant, chose fusion surgery as the treatment." Id. Expert testimony must be reliable, meaning it is based on scientific, technical, or other specialized knowledge; and it also must be relevant, i.e., case specific. See Fed. R.Evid. 702; Kumho Tire Co., Ltd. v. Carmichael, —— U.S. ——, ——, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■■■ The trial court has a "gatekeeping" obligation in accordance with Daubert and its progeny to first determine that the proffered testimony of an expert satisfies the reliability and relevancy foundation for admissibility. An expert's testimony is reliable if the reasoning or methodology underlying the expert's testimony is scientifically valid. See Daubert, 509 U.S. at 592–593, 113 S.Ct. 2786. Factors influencing the validity of a scientific theory include: 1) whether the theory has been or can be tested; 2) whether the theory or technique has been subjected to publication and peer review; 3) the theory's or technique's rate of error; and 4) whether the theory or technique is generally accepted among the expert's peers. See id. at 593–594, 113 S.Ct. 2786. In addition, the expert's testimony must be relevant. In other words, the testimony must "fit" the facts of the case. See Cummins v. Lyle Industries, 93 F.3d 362, 370 (7th Cir. 1996).

■■■ The defendants contend that because the plaintiffs' primary expert, Dr. Steven Trobiani, relied upon the temporal relationship between the plaintiffs' surgeries and the onset of their increased back pain, his testimony is inadmissible because his opinions are unscientific. Moreover, the defendants argue that Dr. Trobiani's opinions are not based upon a scientific

foundation because he does not demonstrate that the plaintiffs suffered nerve injuries caused by a bone screw in the lumbar pedicle, he did not conduct his own research regarding spinal implants, he is inexperienced with rods or plates affixed with bone screws in the pedicle, he formed his opinions regarding pedicle screws solely in the context of his employment as an expert witness, he failed to cite medical literature to support his opinions, and he failed to engage in the standard diagnostic technique of differential diagnosis. The defendants also argue that Dr. Trobiani's testimony does not "fit" the facts at issue because he did not consider factors other than pedicle-screw devices for the plaintiffs' injuries.

The plaintiffs generally aver that Dr. Trobiani confirmed to a reasonable degree of medical certainty that the pedicle screw devices caused the plaintiffs' injuries. However, the plaintiffs do not address the specific arguments raised by the defendants with respect to the admissibility of Dr. Trobiani's opinions.

Dr. Trobiani, a neurologist, reviewed Ms. Valente's medical records and completed the following report dated February 9, 1998:

Review of these records indicates that Victoria Valente initially suffered an injury to her back in December 1989 during a fall in a night club. She was diagnosed with lumbar myofascial pain syndrome and lumbosacral spondylolisthesis Grade 1 and was treated conservatively until April 24, 1992. At that time she underwent bilateral pedicle fixation at L5–S1 with CD rods with intratransverse rods process fusion using L5–S1 iliac bone graft. Following this surgery, Ms. Valente failed to improve and, in fact, developed a worsening of her lumbar pain. She therefore on May 4, 1992 underwent removal of the CD rods and pedicle screws at the L5–S1 level on the left side. Examination of the fusion indicated the fusion to be

fairly intact. Nonetheless, in October of 1992 she continued to complain of back pain and discomfort affecting both lower extremities. She was therefore returned to surgery on April 1, 1993 at which time the last remaining hardware was removed by Dr. Cusick. Since then, she has continued to suffer from back pain which is about half as severe as her back pain before explanation. She has had no further pain extending into her lower extremities but she has continued to suffer from insomnia and depression. She is dependent upon the use of muscle relaxant medication and narcotic analgesics to manage her pain. Her activity is limited.

Based upon review of these records it is my opinion that Victoria Valente is suffering from chronic progressive, severe low back pain consequent to the pedicle screw fixation device inserted on April 24, 1992. The metallic hardware most likely produced irritation to the dural lining of the lumbar thecal sac, which is a pain sensitive membrane. This led to scarring of this membrane and constant residual back pain. This pain will not resolve and this does constitute a permanent injury. To a reasonable degree of medical certainty, the pedicle screw fixation device inserted on April 24, 1992 is the proximate cause of the persistent low back pain and accompanying disability resulting from injury to the dural lining of the lumbar thecal sac. Ms Valente's prognosis is poor.

Dr. Trobiani also conducted a medical examination of Ms. Valente on June 9, 1998, and issued a report, which concludes, in part, as follows:

Victoria (Valente) is clearly at this time suffering from a post-traumatic and post-surgical myofascial pain syndrome. This has spread from the lumbar region to involve the thoracic and cervical regions and is producing significant spasm, pain and postural distortion. This most likely is at least in part consequent to the hardware inserted at the time of her

initial surgery in April 1992 with the hardware producing significant soft tissue inflammatory reaction and, eventually, scarring of fascia and a permanent post-surgical myofascial pain syndrome. In addition, Ms. Valente has continued to experience pain extending in an L5 distribution on the left which followed the insertion of her hardware and most likely is consequent to injury to the L5 nerve root. This pain persisted following removal of the hardware and Ms. Valente continues to show evidence of positive straight leg raising and sensory deficit in an L5 distribution indicating the development of intraneural fibrosis consequent to that injury.

As previously noted, the plaintiffs need to show that their respective injuries were caused by the pedicle screw system, not the fusion surgery itself, because the plaintiffs, on the recommendation of their doctors, elected to undergo fusion surgery. *See Smith*, 21 F.Supp.2d at 921. Victoria Valente is unable to show causation between the pedicle-screw device and her injuries because Dr. Trobiani's opinions are conclusory, Dr. Trobiani does not identify a defect in the design of the pedicle-screw devices, nor does Dr. Trobiani address whether other factors might have caused the plaintiff's injuries. As will be discussed later, this is also true for Trobiani's opinion concerning Brenda Moorer.

Regarding Ms. Valente, Dr. Trobiani opines that "the metallic hardware most likely produced irritation to the dural lining of the lumbar thecal sac, which is a pain sensitive membrane. This led to scarring of this membrane and constant residual back pain." However, Dr. Trobiani fails to state why or how he came to this conclusion. For example, he does not identify a defect in the pedicle screw device and he does not indicate how the pedicle screw device supposedly caused irritation to the dural lining of the lumbar thecal sac.

Dr. Trobiani does not demonstrate that he followed a scientific method, which is a

method of reasoning that involves the testing of a hypothesis. Essentially, Dr. Trobiani states that because Valente's pain increased immediately after the surgery and subsided after the bone screws were removed, the bone screw "most likely" produced irritation, thus causing the pain. Did Trobiani also consider and reject other viable causes for the pain? Did Trobiani consider and reject the effect Valente's other medical problems may have had on her complaints of pain? How does Trobiani respond to the fact that the fusion operation resulted in a solid fusion, which was one of the reasons for use of the bone screws? The fact that Dr. Trobiani did not apparently consider and reject whether other factors might have contributed to Valente's pain is antithetical to the scientific method, in which a hypothesis is tested for accuracy by comparing alternative hypotheses. *See Daubert*, 509 U.S. at 593, 113 S.Ct. 2786 (stating that a crucial issue for determining whether expert testimony is admissible evidence depends on whether opinion was subjected to scientific method).

Dr Trobiani testified at his deposition that pseudoarthrosis—incomplete fusion— is the most serious problem following fusion surgery. He stated that approximately ten to thirty percent of persons who undergo spinal surgery with pedicle fixation devices develop pseudoarthrosis. However, Dr. Trobiani testified that the literature was not clear whether a defect with the pedicle screw devices caused pseudoarthrosis. Moreover, Dr. Trobiani stated that twenty to fifty percent of all fusion surgeries, whether a pedicle screw device is used or not, result in pseudoarthrosis. Thus, it appears that fusion surgeries utilizing pedicle screw devices are in fact more successful on average than fusion surgeries as a whole.

Dr. Trobiani at his deposition testified that the rigid pedicle screw devices may place stress on the bone, thereby impeding the bone's ability to fuse. However, Dr. Trobiani acknowledged that other factors also affect the success of fusion surgery, such as the patient's diet, the patient's age, and the bone mass of a particular patient.

Dr. Trobiani also stated at his deposition that the fact that Valente's pain decreased after the pedicle screw device was removed led him to conclude that the pedicle screws caused Valente's pain. However, Trobiani does not offer an explanation for his conclusion other than the temporal relationship between removing the screws and decreased pain. The following colloquy at Dr. Trobiani's deposition revealed the conclusory nature of his opinion.

Trobiani: The fact that following that removal and the absence of any description of compression of nerve root by a rod at the time of surgery would lead me to conclude that the pedicle screw was the source of the pain. Once the screw was removed, the pain was diminished markedly.

Attorney: Okay. So what you have done is you've taken her description, the fact of the removal of the left side instrumentation, and drawn an inference that the bone screw was causing the discomfort because it diminished markedly after it was withdrawn.

Trobiani: Yes.

Attorney: Is that the totality of your analysis?

Trobiani: Yes.

(Trobiani 6/16/98 Dep. at p. 348).

Finally, the plaintiffs assert that Dr. Trobiani supports his conclusion that the pedicle screws caused the plaintiffs to experience pain by relying on Dr. Harold Alexander. However, the court reviewed Dr. Trobiani's expert reports and depositions, none of which referred to Dr. Alexander. Moreover, even if Dr. Trobiani relied on Dr. Alexander's opinions regarding pedicle screw devices. Dr. Alexander did not offer case-specific testimony. Rather, Dr. Alexander's opinions are limited to the general risks posed by pedicle screw devices.

### b. Brenda Moorer

Similar conclusions can be drawn regarding Dr. Trobiani's opinion concerning Brenda Moorer. Dr. Trobiani reviewed Ms. Moorer's medical records and submitted the following report dated January 12, 1998:

. . . . .

Review of these records indicates that Ms. Moorer developed a complaint of low back pain in June of 1990 which was found to be due to a central disc herniation at L5–S1. Failure to respond to conservative care led to surgery with Dr. Larson on November 9, 1990 consisting of a hemilaminectomy at L5–S1 and Cotrel–Dubusset pedicle screw fixation, L5–S1. Following surgery, Ms. Moorer had good relief of lower limb pain but did have residual lumbar pain until May of 1991 by which time she noted good relief of her low back pain as well.

In September of 1991, Ms. Moorer was involved in a motor vehicle accident during which she was the passenger on a bus which struck an automobile. This was followed by an increase in lower back pain and pain extending into the right gluteal region. She also developed an extension of pain into the posterolateral aspect of the right lower extremity. Ms. Moorer was treated following this injury by a chiropractor for several months. Due to lack of improvement, she returned to Dr. Larson who obtained a CT scan of the lower back and prescribed physical therapy for one month. This was not beneficial and, at the end of therapy, Ms. Moorer added a complaint of numbness involving her right foot. Because of this, Ms. Moorer was returned to surgery by Dr. Larson on May 22, 1992. At the time of surgery, a solid fusion was noted bilaterally between L5 and S1 on the right side at L4–5 there was obvious motion, left greater than right, with no evidence of fusion across the L4–5 transverse processes on the left. The previous L5–S1 CD pedicle screw fixation device was removed and new L4–5 CD pedicle screw fixation was performed at L4–5 with new closed pedicle screws placed at the L5 pedicle holes bilaterally. Steinman pins were placed at the pedicles of L4. A left posterior superior iliac crest bone graft was used for fusion at L4–5.

. . . . .

Because of persistent pain, Ms. Moorer was again returned to surgery by Dr. Larson on May 22, 1992. At the time of surgery a solid fusion was noted bilaterally between L5 and S1. On the right side at L4–L5 there was obvious motion on the left greater than on the right with no evidence of fusion across the L4–L5 transverse processes on the left. The previous L5–S1 Cotrel–Dubusset pedicle screw fixation device was removed and new L4–5 Cotrel–Dubusset pedicle screw fixation was performed at L4–5 with new closed pedicle screws placed at the L5 pedicle holes bilaterally . . .

Following the surgery, Ms. Moorer did well for a short period of time after which her back pain increased and eventually increased to a level greater than that prior to her second surgery . . .

Based upon review of these records, it is my opinion that Ms. Moorer did suffer fusion failure in association with the use of pedicle screw fixation device. The movement noted at the L4–L5 level at the time of surgery most likely led to irritation of the right L5 nerve root with consequent pain extending into the right lower extremity as well as irritation to the dural lining of the lumbar thecal sac. The dural lining of the lumbar thecal sac is a pain sensitive membrane. Irritation to these strictures has resulted in sufficient damage to the right L5 nerve root and the dural lining of the lumbar thecal sac. It is my opinion that this does constitute a permanent condition from which Ms. Moorer will not recover and from which she is permanently and to-

tally disabled. It is my further opinion that the persistent low back pain and injury to the right L5 nerve root has occurred as a consequence of the pedicle screw fixation device inserted at the time of her initial surgery in November of 1990 and is most likely substantially aggravated by the pedicle screw fixation device inserted on May 22, 1992.

In addition, Dr. Trobiani conducted a medical examination of Ms. Moorer, from which he compiled the following report dated June 9, 1998 and offered the following diagnosis:

Brenda Moorer is clearly suffering from a lumbar myofascial pain syndrome manifest by pain, spasm and postural distortion in the lumbar region associated with the hardware currently in place in the lumbar musculature. This most likely has produced irritation to the fascial lining of the musculature and by this time has most likely also produced some degree of scarring, which will result in pain in the lumbar region of a permanent nature. In addition, the pain extending into the right lower extremity in an L5/S1 distribution associated with positive straight leg raising on the right is most likely consequent to irritation to the right L5 and/or S1 nerve root as a consequence of penetration of the medial wall of the pedicle by the pedicle screw inserted in the L5 pedicles. This pain will most likely persist and will necessitate removal of the hardware. Further recommendations for additional treatment will then depend upon her response following hardware removal.

Dr. Trobiani states in his expert report that Ms. Moorer suffered fusion failure, which "most likely led to irritation of the right L5 nerve root with consequent pain extending into the right lower extremity as well as irritation to the dural lining of the lumbar thecal sac." (Expert Report at p. 2). However, as with his opinion regarding Ms. Valente, Dr. Trobiani again fails to identify a specific defect with the pedicle screw system that prevented Ms. Moorer's

vertebrae from fusing. And, as the court noted in *Smith,* one of the pedicle screw cases brought in the Western District of Wisconsin, "fusion surgery, instrumented or noninstrumented, sometimes fails even though properly performed and that even when a solid fusion is obtained pain may not be reduced." 21 F.Supp.2d at 922.

Dr. Trobiani bases much of his opinion on the fact that the plaintiffs pain increased after surgery to a level greater than the pain she experienced before surgery. However, such a conclusory opinion is not entitled to admissibility as expert evidence. Again, Dr. Trobiani did not consider other possibilities for the plaintiff's pain to increase. For example, perhaps the surgery did not work as intended for reasons unrelated to the pedicle screw device, such as the doctor's negligence. Certainly, Dr. Trobiani does not have to consider every factor within the realm of possibility that might have caused the plaintiff's pain to increase, but some statement regarding why the pedicle screw likely caused the plaintiff's pain is necessary to establish the reliability of his opinion. Instead, Dr. Trobiani's simply assumes that if A occurred before B, then A must have caused B. Such reasoning cannot qualify as expert testimony.

In *Smith,* the court rejected an expert's testimony based on his conclusory opinions: "Gerol's (the expert's) report consists of a mere conclusion that since plaintiff's condition worsened after surgery the bad result was caused by the defendant's device. Such a conclusion without any support is not one based on expert knowledge and is not entitled to the dignity of evidence." 21 F.Supp.2d at 922.

As noted above, Dr. Trobiani's testimony suffers from the same deficiencies. His opinion was primarily based upon the fact that the plaintiffs' conditions grew worse following surgery. However, like the *Smith* plaintiffs, Ms. Valente and Ms. Moorer suffered similar pain before their respective surgeries and Dr. Trobiani acknowledged that spinal fusion surgeries

are often unsuccessful with or without the use of pedicle screws.

Moreover, Dr. Trobiani acknowledged at his deposition that Moorer's back pain decreased following fusion surgery utilizing the bone screws, which detracts·from his opinion that the pedicle screws caused Moorer's back pain to increase following fusion surgery:

> Attorney: And as a consequence of that second surgery, she has gone from having ten on a scale of ten back pain to six on a scale of ten back pain?
>
> Trobiani: Correct.
>
> Attorney: And she has reduced her right radicular pain to six?
>
> Trobiani: Correct.
>
> Attorney: And she no longer reports pain on the left of a significant sort?
>
> Trobiani: Correct.

(Trobiani 6/16/98 Dep. at p. 462).

In conclusion, Dr. Trobiani fails to satisfy the *Daubert* standard for expert witnesses. The plaintiffs offer no case-specific expert testimony other than Dr. Trobiani. Accordingly, because the testimony offered by Dr. Trobiani is not admissible, and since the plaintiffs have no other expert testimony regarding causation, the plaintiffs fail to present a prima facie case that the pedicle screw devices caused their injuries. The defendants' motion for summary judgment will be granted and the plaintiffs' claims will be dismissed. Nevertheless, the court will address the defendants' other grounds for dismissing the plaintiffs' claims. The discussion on these motions applies equally to both plaintiffs Valente and Moorer.

## 2. Reliance–Based Claims

■ The defendants argue that the plaintiffs' fail to make prima facie claims for fraud, intentional concealment, and violations of § 100.18, Wis.Stats., because the plaintiffs cannot show that Dr. Cusick and Dr. Larson, the doctors who performed Valente's and Moorer's respective surgeries, had false impressions of bone screws that were induced by the defendants, or that the doctors relied upon the defendants' representations of bone screws when they decided to use the bone screw devices for each plaintiffs' spinal fusion surgery.

The plaintiffs do not respond to the defendants' argument; therefore, the court will proceed on the basis that there is no factual dispute on this issue. *See* Local Rule 6.05(d) (when deciding motion for summary judgment, "court will conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out"). In other words, the court finds that Dr. Cusick and Dr. Larson did not rely on the defendants' representations of the bone screw device when they decided to utilize bone screws for the plaintiffs' respective fusion surgeries. Moreover, Dr. Cusick states that in every case where he recommended or used orthopedic bone screw devices, he did so based on his independent medical judgment. The court will analyze each claim accordingly.

With regard to the plaintiffs' **fraud claim,** the plaintiffs must show that the defendants made a representation of fact regarding the pedicle screw devices, the representation was false, and the plaintiffs believed the representation and relied on it to their detriment. *See Foss v. Madison Twentieth Century Theaters, Inc.,* 203 Wis.2d 210, 218, 551 N.W.2d 862, 865 (Ct. App.1996). In their complaint, the plaintiffs allege that the defendants utilized the advertising media, prepared brochures to urge the use of spinal fixation devices, and intentionally failed to warn the FDCA, physicians, and general public about the lack of testing on the devices and possible side effects posed by the devices. The plaintiffs allege that they and their physicians relied on these claims. in electing to utilize bone screw devices for their respective spinal fusion surgeries.

At the summary judgment stage, the plaintiffs must do more than rely on the

factual allegations contained in their complaint; rather, they must produce evidence to support the factual allegations contained in the complaint. Here, the plaintiffs do not dispute that neither Dr. Cusick nor Dr. Larson relied upon the defendants' representations regarding the bone screw devices when they recommended that the plaintiffs undergo spinal fusion surgery. Moreover, the plaintiffs do not produce evidence to show that they personally relied on the defendants' representations regarding the pedicle screw device when they elected to proceed with spinal fusion surgery. Accordingly, the plaintiffs fail to state claims for misrepresentation.

With regard to the plaintiffs' claim for **intentional concealment,** such a claim also requires the plaintiffs to show that they or their doctors relied on the defendants' alleged misrepresentations. *See Staudt v. Artifex Ltd.,* 16 F.Supp.2d 1023, 1032 (E.D.Wis.1998). Because the plaintiffs submit no such evidence, their intentional concealment claims are dismissed.

Finally, with respect to the plaintiffs' **claims for violations of § 100.18(1), Wis. Stats.,** the plaintiffs must show that the defendants intentionally induced the public to purchase merchandise, either directly or indirectly, by an announcement, statement or representation containing any assertion, representation or statement of fact which was untrue, deceptive or misleading. In addition, to maintain private causes of action for violations of § 100.18(1), the plaintiffs must suffer a pecuniary loss caused by a violation of the statute. *See* § 100.18(11)(b).

As noted above, the plaintiffs do not show that they or their doctors relied on the defendants' allegedly fraudulent representations when they elected to undergo spinal fusion surgery. Therefore, the plaintiffs' cannot show a causal connection between the defendants' alleged conduct and any pecuniary loss suffered as a result of their continued back pain. Accordingly, they fail to state a claim under § 100.18(11)(b). *See Tim Torres Enters.,*

*Inc. v. Linscott,* 142 Wis.2d 56, 70, 416 N.W.2d 670, 675 (Ct.App.1987).

### 3. Negligence Per Se

The plaintiffs claim that the defendants are negligent per se for violating the FDCA. Specifically, the plaintiffs allege that the defendants marketed and sold the CD system, a Class III device under the FDCA, for a uses that was not approved by the FDA—implanting screws into the pedicle of the spine. Under the FDCA, it is unlawful to market and sell a Class III device that has not received premarket approval or is not substantially equivalent to a preapproved medical device. *See* 21 U.S.C. § 351(f).

The defendants present two bases for dismissing the plaintiffs' negligence per se claim. The first, that the plaintiffs fail to show that the pedicle screw device caused their injuries, was already addressed by the court in the defendants' favor and provides an independent basis to dismiss the plaintiffs' claims. The second basis is that Wisconsin does not recognize negligence per se claims based on violations of the FDCA.

The Medical Device Amendments ("MDA") to the FDCA contains the following express preemption provision:

> (a) no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> > (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
> >
> > (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k.

In *Medtronic v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Supreme Court held that the plaintiffs

claim that the defendant violated FDCA regulations was not preempted by the MDA because "the presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." *Id.* at 494, 116 S.Ct. 2240.

In *Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir.1997), a case remanded to the Seventh Circuit by the Supreme Court in light of *Lohr*, the Seventh Circuit held that the FDCA's premarket approval process can constitute the "sort of specific federal regulation of a product that can have preemptive effect." *Id.* at 911. Therefore, the court held that the plaintiffs' strict liability claim against the manufacturer of a collagen compound was preempted by the MDA; the plaintiffs' negligence claim was preempted to the extent that they alleged that the defendant was negligent despite its adherence to the FDCA; and the plaintiffs' mislabeling, misbranding and adulteration claims were preempted to the extent that such claims alleged that the defendant incurred liability under state law despite its conformity to the FDCA. However, the court held that to the degree such claims could be construed to allege that the defendant failed to meet the standards set forth in the premarket approval process, the claims were not preempted. "[A] state judgment premised on the truth of those allegations would not set up a requirement 'different from or addition to,' those established by the FDCA." *Id.* at 914.

■ Under Wisconsin law, violation of a safety statute constitutes negligence per se if: 1) the harm inflicted was the type the statute was designed to prevent; 2) the person injured was within the class of persons sought to be protected; and 3) there is some expression of legislative intent that the statute become a basis for the imposition of civil liability. *See Tatur v. Solsrud*, 174 Wis.2d 735, 743, 498 N.W.2d 232, 235

(1993). The defendants concede that the alleged harm suffered by the plaintiffs is the type for which the FDCA and MDA were designed to prevent and that the plaintiffs are within the class of persons sought to be protected. Nevertheless, the defendants contend that the third element is missing in that there is no expression contained in the FDCA or MDA to indicate that the regulations are bases for imposing civil liability. The court proceeds on the basis that the plaintiffs' claim for negligence per se is limited to their allegation that the defendants marketed and sold the CD system, a Class III device, for a use that was not authorized by the FDA.

The defendants rely on Judge Shabaz's opinion in *Cali* that negligence per se based on violation of an FDCA regulation is not actionable under Wisconsin law. In *Cali*, Judge Shabaz acknowledged that the FDCA does not preempt a state claim for negligence per se. However, Judge Shabaz ruled that Congress did not intend for the FDCA to become a basis for civil liability: "Far from containing an expression that FDCA regulations are intended to form the basis for civil liability, the law expresses the opposite intention ... There is no explicit private right of action and no suggestion that the act creates an implied right of action." 24 F.Supp.2d at 954. Therefore, Judge Shabaz held that the plaintiffs claims did not meet the third element for negligence per se under Wisconsin law—legislative intent to make the statute a basis for civil liability.

This court's analysis is different than that expressed by Judge Shabaz. First, even though the FDCA does not create an express or implied private right of action under federal law, the Supreme Court in *Lohr* inferred that Congress's failure to provide such a federal remedy was persuasive evidence **not** to preempt common law liability for such conduct:

> Medtronic's construction of § 360k would therefore have the perverse effect of granting complete immunity

from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use." It is, to say the least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct."

*Lohr,* 518 U.S. at 487, 116 S.Ct. 2240 (quoting *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)) (citations omitted).

Therefore, the Supreme Court did not interpret the lack of an express or implied federal cause of action as precluding a state common law cause of action based on violation of the statute, as Judge Shabaz inferred in *Cali.* To the contrary, the Court inferred that Congress intended, by not including an express or implied federal cause of action in the FDCA, to impose liability on FDCA violators through state common law claims when such claims parallel federal requirements. *See id.* at 495, 116 S.Ct. 2240. By definition, a claim for negligence per se based on violation of an FDCA regulation parallels federal requirements.

Second, while the law is settled that Congress did not expressly intend for the FDCA to become a basis for civil liability under federal law, "intent may be inferred from the language and the surroundings of the statute." *See Johnson v. Blackburn,* 220 Wis.2d 260, 280, 582 N.W.2d 488, 497 (Ct.App.), *rev. granted,* 220 Wis.2d 363, 585 N.W.2d 156 (1998). In *Lohr,* the Supreme Court noted that the MDA was enacted "to provide for the safety and effectiveness of medical devices intended for human use" and that the primary issue motivating the MDA's enactment was "the safety of those who use medical devices." 518 U.S. at 490–491, 116 S.Ct. 2240. Such clear intent that the statute's primary motivation is to protect the safety of those who use medical devices is sufficient to infer the intent of Congress that the statute be used as a basis for civil liability under state common law.

For example, in *Johnson v. Blackburn,* the Wisconsin Court of Appeals held that the Wisconsin legislature intended to impose civil liability when it enacted a statute requiring owners of residential property to install smoke detectors in the property. Although the statute did not provide an express statement regarding liability, the court held that the statute's clear expression of concern for safety was sufficient to show that the legislature intended to allow the statute to be used as a basis for civil liability. 220 Wis.2d at 281, 582 N.W.2d at 497.

Similarly, in the instant case, Congress's clear expression that the MDA was enacted to protect a certain class of people—users of medical devices—is sufficient under Wisconsin law to show that Congress intended to allow the MDA to be used as a basis for civil liability under state common law. Therefore, in the opinion of this court, if the plaintiffs could show causation, they could assert negligence per se claims against the defendants based on the defendants' alleged violation of FDCA regulations. The court underscores the fact that its decision regarding negligence per se based on violation of the FDCA is limited to the specific FDCA violation alleged by the plaintiffs—that the defendants did not receive premarket approval to market and sell the CD system for inserting screws into a person's pedicles, contrary to 21 U.S.C. § 351(f). In other words, the court's decision should not be construed to allow negligence per se claims based on alleged violations of any parts of the statute that are not concerned with the FDCA's overall purpose—to provide for the safety and effectiveness of medical devices intended for human use. Nevertheless, because the court determined that the plaintiffs' expert testimony is insufficient to raise a factual dispute regarding causation, the plaintiffs' negligence per se claims must be dismissed.

To conclude, the plaintiffs fail to offer admissible expert testimony to show that the pedicle screw device designed, manufactured, promoted, distributed, and sold by the defendants caused the plaintiffs to sustain injuries. Accordingly, the defendants' motion for summary judgment will be granted and all of the plaintiffs' claims will be dismissed. Moreover, the plaintiffs do not present evidence to show that they or their doctors relied on the defendants' alleged misrepresentations regarding the efficacy and safety of the pedicle screw device when the plaintiffs elected to undergo spinal fusion surgery using the pedicle screw method. Therefore, the plaintiffs' claims for fraud, intentional concealment and violation of § 100.18, Wis. Stats., are dismissed on grounds independent of and in addition to the causation issue. Because Ralph Abagian's claims are dependent upon Victoria Valente's claims, his claims are also dismissed.

Having dismissed all of the plaintiffs' claims, the defendants' motion to exclude the plaintiffs' expert witness from testifying at trial is denied as moot; the defendants' motion for leave to file an amended answer is denied as moot; and the parties' motions in limine are denied as moot.

**IT IS THEREFORE ORDERED** that:

1. The defendants' motion for summary judgment is **granted,** and judgment will be entered in favor of the defendants **dismissing** the plaintiffs' complaint and this action with prejudice, together with the costs and disbursements of this action. Accordingly, the jury trial scheduled to commence on May 18, 1998, with respect to Valente's and Abagian's claims is removed from the court's calendar and the trial scheduled to commence on August 16, 1999, with respect to Moorer's claims is also removed from the court's calendar.

2. The defendants' motion to exclude the plaintiffs' expert witness from testifying at trial is **denied as moot.**

3. The defendants' motion for leave to file an amended answer is **denied as moot;** and

4. The parties' motions in limine are **denied as moot.**