William MENGES, Plaintiff,

v.

DEPUY MOTECH, INC., et al., Defendants.

No. 3:96 CV 0026 AS.

United States District Court, N.D. Indiana, South Bend Division.

June 11, 1999.

Andrea S. Lestelle, Terrence J. Lestelle, Lestelle and Lestelle, Metairie, LA, Roy F. Amedee, Jr., LaPlace, LA, for William Joseph Menges.

Mark D. Boveri, Barnes and Thornburg, South Bend, IN, for Depuy Motech Inc.

Michael R. Fruehwald, Barnes and Thornburg, Indianapolis, IN, for Depuy Motech Inc., Depuy Inc.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This case is one of more than two thousand separate products liability actions filed in this country by more than five thousand plaintiffs claiming that defective "pedicle screw fixation devices" which were surgically attached to the pedicles of their spines during spine fusion surgery have caused them to suffer physical injuries. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multi district Litigation (MDL) transferred these cases to the United States District Court for the Eastern District of Pennsylvania for consolidated pretrial proceedings. The MDL court, through Judge Louis C. Bechtle, managed the litigation through extensive procedural matters, including dismissal of the original complaints, the filing of amended omni complaints, discovery, and the resolution of numerous motions. In April 1997, Judge Bechtle issued a thorough opinion in *In re Orthopedic Bone Screw Products Liability Litigation*, No. MDL 1014, 1997 WL 186325 (E.D.Pa. April 16, 1997), detailing the plaintiffs' allegations in the consolidated omni actions, describing the pertinent regulatory framework of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.,* and its Medical Device Amendments, 21 U.S.C. § 360(a) *et seq.* The pre-trial proceedings have now been completed as respects pleading, discovery, and motions that the transferee court determined could and should be considered in the transferee court. The motions that remain to be considered, when filed in the transferor courts are those that are both case and fact specific as opposed to motions that would affect issues that apply to either substantial numbers of cases or all cases in MDL No. 1014. Accordingly, the MDL court has remanded cases to their respective District Courts. *See In re Orthopedic Bone Screw Products*

*Liability Litigation,* 1998 WL 411380 (E.D.Pa. June 30 1998). Defendant filed its motion to dismiss on January 20, 1999. The parties have fully briefed the issues and this Court heard oral argument on May 7, 1999. Defendant's motion is now ripe.

## JURISDICTION

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 due to diversity of the parties and a proper amount in controversy. Plaintiff and all treating physicians are residents of Wisconsin. Defendant is an Indiana corporation with its principal place of business in Warsaw, Indiana.

## FACTS

On September 15, 1993, Plaintiff, William Menges (Menges), injured his lower back when he fell while at work. He experienced severe back and hip pain after the fall and was examined by Dr. Richard Karr, an orthopedic surgeon who diagnosed Menges as having a slippage (spondylolisthesis) of his L5 vertebra and a narrowing of his L4–L5 disk space.[1] Dr. Karr noted that in his opinion the fall aggravated a pre-existing lumbar spinal stenosis and accelerated the problem. Fusion of the L5–S1 and L4–L5 vertebrae was recommended.

In 1994 due to continuing severe back and left leg pain, Menges consulted with Dr. Stephen Robbins, an orthopedic surgeon. Dr. Robbins confirmed the earlier diagnosis and recommended anterior and posterior fusion surgery using MOSS instrumentation on the posterior site. Defendant manufactures the MOSS instrumentation.

On February 10, 1994, Dr. Robbins performed the surgery. There were no recorded complications. After the initial surgery Menges initially had improvement in his back and leg pain. On May 3, 1994 an X-ray revealed a fractured screw in

Menges spine. Dr. Robbins noted that there was no change in the position of the instrumentation and the alignment of the lumbar vertebrae was within normal limits. He continued to follow Menges post-operative progress.

By August 16, 1994, Menges was complaining of headaches. Dr. Robbins noted that these were usually related to exertion. Menges also continued to complain of back pain. X-rays showed both S1 screws had fractured. Dr. Robbins indicated that further tests needed to be done to rule out a meningocele. He suggested that if a meningocele was found it would need to be surgically repaired and recommended that at that time Menges hardware could be changed to a larger device.

A myelogram and CT scan performed on August 30, 1994, revealed a pseudomeningocele (leakage of spinal fluid) in the L5–S1 area. The fluid had collected outside the dural sac from L3 to S1. As a result of the fluid leak, Dr. Robbins indicated additional surgery was needed to close the site. Additionally, Dr. Robbins informed Menges that he would remove the MOSS instrumentation and replace it with a larger (MOSS Miami) device. The surgery was performed on September 1, 1994. During this surgery Dr. Robbins found evidence of pseudarthrosis (failure to fuse). His post operative notes indicate that he found a slight tear along the proximal lateral aspect of the nerve root sheath and that the CSF fluid was leaking from there. The tear was successfully repaired. Dr. Robbins later testified that in his opinion the dural leak interfered with the posterior fusion by decreasing the blood flow to the area where fusion was being attempted (Robbins Dep. 38, 61–62) He further testified that the leak most probably occurred during the original surgery and was unrelated to the MOSS device. (Robbins Dep. 36–37, 75–76).

---

1. The spine consists of three areas, cervical (C), lumbar (L) and sacral (S). Vertebrae are numbered in descending order. Menges' injury was in his lower lumbar, upper sacral area.

Dr. Robbins continued to see Menges for follow-up until November 29, 1994. During this time Menges continued to complain of back and leg pain. X-rays showed good positioning of the Moss Miami device and ongoing consolidation of the fusion. (Robbins Dep. 44). Dr. Robbins noted that Menges' symptoms were most likely secondary to normal scar tissue formed after the surgeries or irritation from the dural tear, or both, but were unrelated to the instrumentation. (Robbins Dep. 44–45, 77–78 see also Robbins medical notes of 11/29/94).

In January 1995, Menges changed doctors and began seeing Dr. Lawrence Frazin, a neurosurgeon. Dr. Frazin noted that "the patient's course was complicated by the development of a pseudomeningocele which required another surgery." (Frazin Notes 1/25/95). After several visits, diagnostic tests and x-rays Dr Frazin concluded that as of September 1995 the fusion attempted in September 1994 was solid throughout. The pedicle screw position appeared appropriate and the bone graft was appropriately positioned. (Id.) He also noted that Menges had a narrowing in a new area of his spine at the L3–L4 and L2–L3 levels and had generalized disk bulging. (Id.) In February 1995, Dr. Frazin referred Menges for treatment for failed back syndrome. Menges did not wean himself from narcotic medication and nor did he continuously participate in physical therapy as his doctor had prescribed. He claimed he was in too much pain. Dr. Frazin's September 26, 1995 note states that X-rays show the hardware is in good position with no evidence of fracture and the posteriolateral fusion appears good. He referred Menges to a pain specialist.

Menges filed this lawsuit on January 10, 1996. On February 16, 1996, Dr. Karr opined that Menges had reached an end of healing relative to the 9/93 workplace injury and released him to return to work with four permanent work restrictions pertaining to lifting and bending. He suggested physical exercise, weight loss and weaning Menges off pain-killers.

## BACKGROUND

Spinal fusion surgery is a method of placing bone graft material between two mobile segments of the spine to knit them together as one bony unit and eliminate motion between the segments. Fusion surgery can be performed with or without the use of spinal instrumentation for internal fixation. With or without the aid of internal fixation instruments, there is a risk that the fusion will not occur. Internal fixation instruments are used to provide stability to decrease motion between segments of the spine to allow the bone fusion to knit together. They act as an internal splint. If a solid fusion is obtained, the device is no longer providing structural support and can be removed. If a solid fusion is not obtained at some point in time the internal fixation device will fail. Internal fixation devices may be attached with hooks, wires or bone screws. When bone screws are employed they are screwed into the pedicles of a vertebra and connected to rods or plates to stabilize movement between the vertebrae to which they are connected. Smith v. Sofamor, S.N.C., 21 F.Supp.2d 918, 919 (W.D.Wis. 1998).

Under the Medical Device Amendments ("MDA") to the Federal Food, Drug and Cosmetic Act ("FDCA"), medical devices intended for human use are classified as Class I, II, or III devices. Class I devices are considered to present the least risk to human safety and are subject to "general controls;" Class II devices present more risks to human safety than Class I devices and are subject to special controls; and Class III devices present the most risk to human safety and are subject to "premarket approval," which is designed to provide a "reasonable assurance of . . . safety and effectiveness" for the most dangerous medical devices. See 21 U.S.C. §§ 360c(a)(1)(C), 360e(e) and 360i(a). Premarket approval under the MDA requires

applicants to submit an application detailing: 1) extensive safety testing data; 2) the contents and operation of the device; 3) a description of methods used to manufacture, process, package, and install the device; 4) samples of the device; 5) proposed labeling for the device; and 6) all other information requested by the FDCA. 21 U.S.C. § 360e(c)(1). Once the device is approved, the Federal Food and Drug Administration ("FDA") regulations prohibit the device from being manufactured, packaged, stored, labeled, distributed, or advertised in a manner inconsistent with the conditions of approval. 21 C.F.R. § 814.80. The FDA retains the power to monitor the device and withdraw approval if the device becomes unsafe. 21 U.S.C. §§ 360e(e)(1)–(3) and 360(I).

During the period in which the plaintiff underwent spinal fusion surgery, the pedicle screw device was classified as a Class III device and was not approved by the FDA for implanting into the pedicle region. However, the screws used in the plaintiff's surgeries were marketed, labeled, and sold pursuant to a 1987 clearance letter issued by the FDA. The plaintiff alleges that because the pedicle screw device was not approved by the FDA for implantation into the vertebral pedicle, the defendant had a duty not to commercially market the devices for spinal usage and to regulate the use of the devices in hospitals. Moreover, the plaintiff alleges that pedicle screw devices were misbranded, improperly labeled, and marketed for a use for which they were not FDA approved. In addition, the plaintiff alleges that the pedicle screw devices were unreasonably dangerous and were defective.

Defendant asserts it is entitled to summary judgment because 1) there are no genuine issues of fact on the essential element of causation; 2) there are no genuine issues of fact on the essential element of defect; 3) Menges cannot create a genuine issue on the essential elements of negli-

gence, and 4) several claims are not recognized under Wisconsin law.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762 (7th Cir.1993). *See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.[2] Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts shows that there is a genuine [material] issue for trial.'" *Id.* The nonmoving party cannot rest on its pleadings, *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir.1994); *Hughes v. Joliet Correctional Ctr.*, 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v.*

---

**2.** The parties agree that Wisconsin law is controlling in this case as the Plaintiffs were at all relevant times residents of Wisconsin and the surgeries were performed in Wisconsin.

*O'Lessker,* 953 F.2d 1079, 1081 (7th Cir. 1992).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994), *cert. denied,* 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995); *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991), *reh'g denied,* 1993 WL 518446. Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–55, 106 S.Ct. 2505. Applying these principles the Court addresses Defendant's motion.

## II. DISCUSSION

As a threshold matter, the Court will address defendant's argument that Menges has failed to offer sufficient proof of causation, as causation is an element not only in the strict liability claim but in the negligence and *per se* negligence claims as well.[3] *Glassey v. Continental Insurance Co.,* 176 Wis.2d 587, 500 N.W.2d 295, 300 (1993) (strict liability); *Miller v. Wal–Mart Stores, Inc.,* 219 Wis.2d 250, 580 N.W.2d 233, 238 (1998) (negligence), *reconsideration denied.* In order to survive a motion for summary judgment, Menges must carry the burden of proof that the Defendant's device proximately caused his injuries. The standard for causation is: whether the defect was a substantial factor in producing the injury.... "It need not be the sole factor or the primary factor, only a 'substantial factor.' The phrase

'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense. There may be several substantial factors contributing to the same result." *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis.2d 338, 360 N.W.2d 2, 11 (1984) (citations and quoted source omitted). *Tanner v. Shoupe,* 228 Wis.2d 357, 596 N.W.2d 805 (1999); *Sita v. Danek Medical, Inc.,* 43 F.Supp.2d 245 (E.D.N.Y. 1999). Proof of legal causation in a medical device case must be by expert testimony and the expert's opinion must be stated in terms of reasonable probability. *Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 972 (4th Cir.1990); *Alexander v. Danek Medical, Inc.,* 37 F.Supp.2d 1346 (M.D.Fla. 1999). Furthermore, the proponent of expert testimony must show by a preponderance of the evidence that the witness is qualified. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge. *Kumho Tire Co., Ltd., v. Carmichael,* 526 U.S. 137, ——, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

To date, the majority of district courts that have dealt with the MDL Bone Screw cases on remand have found causation lacking.[4] *But see, Sita,* 43 F.Supp.2d

---

**3.** Strict liability and negligence are alternative theories of recovery in Wisconsin products liability cases. The most beneficial aspect of the strict products liability rule is that it relieves the plaintiff of the difficult task of proving specific acts of negligence and insulates the plaintiff from the implied warranty defenses of notice of breach, disclaimer, and lack of privity. *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55, 61 (1967).

**4.** *See generally, Valente v. Sofamor, S.N.C.,* 48 F.Supp.2d 862 (E.D.Wis. 1999); *Wheat v. Sofamor, S.N.C.,* 46 F.Supp.2d 1351 (N.D.Ga.

1999); *Hartwell v. Danek Medical, Inc.,* 47 F.Supp.2d 703 (W.D.Va.1999); *McLellan v. Sofamor–Danek Group, Inc.,* No. 95–CV–0322, 1999 WL 222591 (W.D.N.Y. April 12, 1999); *O'Brien v. Sofamar,* No. 96–8015, 1999 WL 239414 (E.D.Pa. Mar.30, 1999); *Cali v. Danek Medical Inc.,* 24 F.Supp.2d 941 (W.D.Wis. 1998); *Coleman v. Danek Medical, Inc.,* 43 F.Supp.2d 637 (S.D.Miss.1999); *Driggers v. Sofamor S.N.C.,* 44 F.Supp.2d 760 (M.D.N.C. 1998); *West v. Danek Medical, Inc.,* No. 97–575, 1998 WL 1041327 (W.D.Okla. Dec.28, 1998); *Leigh v. Danek Medical, Inc.,* No. 95–CV–797, 1998 WL 1041329 (W.D.Tex. Dec.

245; *Taylor v. Danek Medical, Inc.*, No. 95–7232, 1998 WL 962062 (E.D.Pa. Dec.29, 1998). The major difficulty in most of those cases has been the knowledge, skills and training (or lack thereof) of the proffered expert. While courts are not to impose overly rigorous requirements of expertise and must be satisfied with more generalized qualifications, the fact remains that a witness without sufficient knowledge, either through training or experience, may not testify as an expert. *Wheat,* 46 F.Supp.2d 1351; *Burton v. Danek Medical, Inc.*, No. 95–5565, 1999 WL 118020 slip op. (E.D.Pa. March 1, 1999), *petition .for cert. filed* 67 USLW 3684 (May 3, 1999). For example, in *O'Brien,* the court found that a board certified neurologist with no training or education in instrumented spinal fusion surgery was not qualified to testify. *O'Brien,* 1999 WL 239414 slip op. at *3. *See also, Burton,* 1999 WL 118020 at *3 (holding same). Similarly, the *Wheat* court found a board certified anesthesiologist who specialized in pain management and had treated patients with spinal instrumentation was not qualified under *Daubert. Wheat,* 46 F.Supp.2d 1351. In addition to sufficient knowledge and training, an expert's testimony must be "reliable." *Daubert,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. Recently a Wisconsin district court found causation lacking where experts offered only conclusory opinions, did not address whether other factors might have caused the plaintiff's injuries, and failed to state why or how he came to his conclusions. *Valente,* 48 F.Supp.2d 862, 869; *Cali,* 24 F.Supp.2d 941; *see also Hartwell* 47 F.Supp.2d 703 (Virginia district court holding same).

14, 1998); *Conger v. Danek Medical, Inc.,* 27 F.Supp.2d 717 (W.D.Tex.1998); *Love v. Danek Medical, Inc.,* No. 3:95CV–706–S, 1998 WL 1048241 (W.D.Ky. Nov.25, 1998); *Smith,* 21 F.Supp.2d 918.

5. Dr. McKenzie is board eligible, not board certified. This medical distinction carries some weight *as to the issue of expertise and reliability.*

In the present case, Menges offers the testimony of Dr. Jerry McKenzie as his expert supporting medical causation. Dr. McKenzie bases his opinion solely on review of the medical records and his expertise as a physician licensed in Oklahoma. (Plf.'s Response Brief, Ex. 10). Dr. McKenzie is board eligible in emergency medicine.[5] His credentials show that he is not trained in neurology, neurosurgery, spinal instrumentation or even general surgery. There is no evidence that Dr. McKenzie has ever performed or assisted with any spinal surgery or ever researched or published in the area of spinal fusion or instrumentation. Thus, the record reflects that Dr. McKenzie has not demonstrated a sufficient degree of knowledge to meet the liberal standard for qualification as an expert witness in this case. In addition, even assuming Dr. McKenzie's credentials qualified him as an expert his opinion is unreliable. First, he opines that the pedicle screw device "did not provide any medical advantage or benefit to Menges because Menges developed a failed lumbar spine syndrome." [6] (*Id.* at 2) It is insufficient for the causation expert to merely testify that the surgery itself was not successful or did not achieve the desired results. *Hartwell,* 47 F.Supp.2d 703, 707–08. "Fusion surgery whether instrumented or non-instrumented sometimes fails ..." *Smith,* 21 F.Supp.2d 918, 922. Additionally he opines that the spinal fixation system resulted in localized chronic inflammatory response. (*Id.*) However, he fails to state how or why he came to this conclusion and provides no scientific or medical evidence to support his claim. *See Valente,* 48 F.Supp.2d 862, 869 (finding such an opinion inadmissible). Dr. McKenzie also does not consider and reject any other viable causes for Menges problem.[7] *Compare*

6. Failed back syndrome is essentially a condition where a person has lumbar surgery with a poor result. (Frazin Dep. 19) In effect, it means that the surgery made no difference.

7. The record contains evidence that Menges suffered from spondylolisthesis (shifting vertebrae), stenosis, disk disease, a dural leak and being overweight. None of these issues are discussed by Dr. McKenzie. Where several

*Smith*, 21 F.Supp.2d 918 (quoting *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994) "where symptoms may be the subject of a variety of causes it is insufficient for the expert to opine as to the cause without some scientific basis other than his assertion of general expertise"). Finally, Dr. McKenzie opines that the fractured pedicle screw necessitated additional surgery. He does not even address Menges' frequent headaches which were a significant problem and necessitated additional surgery. It was discovered that the headaches were caused by a pseudomeningocele and dural leak. The treating physicians clearly state that the pedicle screws had nothing to do with causing the leak and that surgery was necessary to close it. (Robbins Dep. 36–37, 75–76) *Compare Cali*, 24 F.Supp.2d 941. Accordingly, Dr. McKenzie's testimony as to medical causation suffers from a lack of specificity and fails to meet the standard set forth in *Daubert*.

■ In addition to Dr. McKenzie, Menges offers the testimony of Dr. Harold Alexander in support of his defective product claim. Dr. Alexander has a Ph.D. and is an expert in the field of orthopedic bioengineering. Judge Bechtle in the MDL court has already ruled on a *Daubert* challenge to Dr. Alexander. Judge Bechtle found that Dr. Alexander was qualified to testify "on matters concerning orthopedic bioengineering, biomaterial, biomechanical engineering, and design and analysis of device research." *Taylor v. Danek Medical, Inc.*, 1999 WL 310647. However, the court pointed out that Dr. Alexander's expertise in bioengineering "does not necessarily make him particularly qualified to make statements in the additional disciplines of law, medicine, orthopedics, FDA regulatory practices . . . ." and that plaintiffs could not "piggyback" Dr. Alexander's

qualification in orthopedic bioengineering to warrant his elevation to expert rank in those areas. *Id.* Accordingly, the law of the case dictates that Dr. Alexander is not qualified to testify as to medical causation in this case. This leaves Menges with a qualified expert competent only in the area of the alleged product defect not medical causation. In an effort to get around this problem Menges asserts that additional expert testimony is not necessary as the records and statements from the treating physicians clearly indicate the fracture of the pedicle screws contributed to his problems. During its summary judgment analysis the Court will address the sufficiency of this claim as it pertains to the appropriate counts of Menges' Complaint.

## A. COUNT I—STRICT LIABILITY

■ Under the theory of strict products liability, a manufacturer is liable for the harm caused by a product to the user or consumer if: (1) the product was in defective condition when it left the possession or control of the seller, (2) it was unreasonably dangerous to the user or consumer, (3) the defect was a cause of the plaintiff's injuries or damages, (4) the seller engaged in the business of selling such product (it was not an isolated transaction unrelated to the principal business of the seller), and (5) the product was one that the seller expected to, and that did, reach the user or consumer without substantial change in the condition it was in when he or she sold it. *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55, 63 (1967); *Mountain v. Procter & Gamble Co.*, 312 F.Supp. 534 (E.D.Wis.1970).

### 1. Defect:

■ Defendant claims that Menges cannot assert any genuine issues of fact on

---

factors could have caused an injury, a plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such

causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Prosser, Torts, 245 (3d ed.1964).

the essential element of a defect. The record shows that one of the screws implanted in Plaintiff's spine fractured or broke within two months of his first surgery. Two other screws fractured within seven months. Menges asserts this is clear evidence of a product defect. Even if this Court assumes as fact that the fracture of the screws did directly cause continuing pain and discomfort that necessitated further surgery, this does not mean that *ipso facto* the device was defective. *Alexander v. Danek Medical, Inc.*, 37 F.Supp.2d 1346, 1349 (M.D.Fla.1999). *See Sita*, 43 F.Supp.2d 245, 253–56 (fact that screw broke ten months after implantation not itself evidence of defect); *Savage v. Danek Medical, Inc.*, 31 F.Supp.2d 980 (M.D.Fla.1999) (two weeks after surgery one screw loosened, not evidence of defect).

■■■■■ A defect must be proven by expert testimony. *See Savage*, 31 F.Supp.2d 980, 983; *Wheat*, 46 F.Supp.2d 1351, 1359. To establish a product defect in this case, Menges offers the testimony of Dr. Alexander, Ph.D.[8] Dr. Alexander testified that "there is no scientifically valid evidence that pedicle screw spinal instrumentation is effective or safe." (Aff. & Report of Alexander ¶ 4). This is not the same as providing valid, scientific evidence that the device is not safe or effective. He also testifies as to a higher rate of complication in spinal fusion when pedicle screw instrumentation is employed (*Id.* ¶ 6); nerve injury, irritation or compression (*Id.* ¶ 7); and that mechanical failures of spinal instrumentation are primarily attributable to poor design and inadequate testing. (*Id.* ¶ 8). Dr. Alexander then opines that the Moss instrumentation implanted in Menges' spine did not have sufficient mechanical strength to withstand reasonably foreseeable tension, bending, and torsional loads (*Id.* ¶ 12), and that the instrumentation provided no medical advantage or benefit to Menges. Dr. Alexander bases his opinions on his extensive review of various research literature, his qualifications and expertise in biomechanics and his review of Menges' medical records. He also points out that the FDA has not approved the product for this specific type of use and therefore concludes it is not reasonably safe. However, Dr. Alexander has not performed any independent tests on the Moss instrumentation nor has he examined Menges. As discussed, *supra*, neither has Dr. Alexander ruled out any other cause for the fracture of the pedicle screw. He has not discussed the effect Menges' weight, 250 pounds, had on the pedicle screws. Similarly, he has not pointed to anything unique about the Moss instrumentation that makes it more likely to fracture than any other spine instrumentation. Courts have found this type of conclusory testimony insufficient to prove a product defect. *See Sita*, 43 F.Supp.2d 245, 256 (court rejected Dr. Alexander's opinion even though patient had a fractured screw); *Kirkman v. Sofamor, S.N.C.*, No. 98CV100, 1998 WL 666706 at *4 (W.D.N.C. July 21, 1998) (screw broke through the pedicle wall but court rejected expert's opinion because he did not rule out other causes and merely claimed this occurred due to defect). A device failure or malfunction will not, without more, render a manufacturer liable. *Harwell v. American Medical Sys., Inc.*, 803 F.Supp. 1287 (M.D.Tenn.1992). Menges argues that specific proof of a defect is not necessary because the undisputed multi-component mechanical failure of the screws within the normal healing period for a spinal fusion constitutes circumstantial evidence that it was defective which therefore, un-

---

8. As discussed previously, Dr. Alexander's report was first presented in the MDL proceeding where Judge Bechtle ruled that "Dr. Alexander's background and experience qualify him to testify on matters concerning orthopedic bioengineering and its related disciplines, which in this case generally means how pedicle screws function in the human body and how the human body functionally, but not medically, responds to pedicle screws." *In re Orthopedic Bone Screw Products Liability Litigation*, 1997 WL 39583 *3 (E.D.Pa.1997).

der Wisconsin law, allows a *res ipsa* inference that the device is defective.

■ Menges asserts that the doctrine of *res ipsa loquitur* applies in this case. *Res ipsa* allows jury to infer that a defect existed when the product left the manufacturer's control and that the defect caused the product to break if the problem ordinarily occurs only if there is negligence, the plaintiff was properly using the product, and the plaintiff can disprove intervening causes of the defect that could have occurred after the product left the manufacturer's control. *Estate of LeMay by LeMay v. Eli Lily & Co.*, 960 F.Supp. 183 (E.D.Wis.1997); *Jagmin v. Simonds Abrasive Co.*, 61 Wis.2d 60, 211 N.W.2d 810, 817 (1973). Roughly interpreted as "the thing speaks for itself," *res ipsa* allows a jury to infer a defect caused a product to break when the plaintiff has provided the proper foundation. *Rennick v. Fruehauf Corp.*, 82 Wis.2d 793, 264 N.W.2d 264, 267 (1978). "Thus a *res ipsa* type of inference is enough to establish a defect if the plaintiff can show that he was properly using the product and can negative other possible causes of the product failure since it left the manufacturer's control." *Powers v. Hunt–Wesson Foods, Inc.*, 64 Wis.2d 532, 219 N.W.2d 393, 396 (1974).

In this case the record does not support such a finding. Fatal to Menges' argument is the fact that he made no attempt to rule out any other cause for his pain and alleged injury nor has he made a showing from which this court could infer that screws only break when the manufacturer fails to follow FDA regulations. Moreover, even if the court accepted the broken screws as evidence of a defect and construing all facts in a light most favorable to Menges, his strict liability claim still fails.

## 2. Unreasonably Dangerous

■ Dr. Alexander contends that the Moss device is unreasonably dangerous because the FDA has not approved the product specifically for pedicle use. The fact that a medical device has not been approved by the FDA for a particular use does not mean that the device is unsafe, much less that the device is defective. *Sita*, 43 F.Supp.2d 245, 256. The use of the Moss instrumentation in this case was what is commonly known as "off-label" use. Such a use by physicians is not prohibited by the FDA. *In re Orthopedic Bone Screw Products Liability Litigation*, 1996 WL 107556 at *3; *Sita*, 43 F.Supp.2d 245, 261; *Talley v. Danek*, 7 F.Supp.2d 725 (E.D.Va.1998). The FDA permits doctors to prescribe drugs [and internal fixation devices] for 'off-label' uses. *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir.1994). Doctors commonly exercise professional medical judgment and prescribe [devices] for uses not within the indications articulated by the FDA. *Weaver v. Reagen*, 886 F.2d 194 (8th Cir.1989).

■ Finally, even if the Court accepts the position that the screw was defective, Menges has failed to provide a sufficient connection between the broken screw and his injury. As discussed *supra*, there is insufficient proof of medical causation. There is no specific description of how the screw actually caused the injuries alleged in the instant case. *See Baker v. Danek Medical* 35 F.Supp.2d 875 (N.D.Fla.1998); *Smith*, 21 F.Supp.2d 918; *Cali*, 24 F.Supp.2d 941. Dr. Alexander opines that the failure of the Moss instrumentation necessitated the additional surgery of 9/1/94 to repair and replace it. This opinion goes to medical causation, an area in which Dr. Alexander is not qualified to testify. Additionally, Dr. Alexander fails to account for the fact that a dural leak necessitated surgery. Furthermore, Menges' argument that testimony from his treating physicians proves causation is unsupported according to this Court's reading of the record. The medical notes from treating physicians Karr, Robbins and Frazin simply do not provide proof that the MOSS instrumentation was a substantial cause of Menges' problems. Menges focuses on an exam note made by Robbins stating "I do feel the broken hardware is

certainly contributing to his symptoms." (Robbins pre-op. note 9/1/94) This statement was made in a preoperative report which notes degenerative disk disease, a pseudomeningocele and a dural leak. The fact that Dr. Robbins commented on the broken hardware contributing to symptoms is hardly sufficient proof of causation, especially since none of the other contributing factors were examined or ruled out.

### B. COUNT II—NEGLIGENCE

 In order to maintain a cause of action for negligence in Wisconsin, there must exist: (1) a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and injury; and (4) an actual loss or damage as a result of the injury. *See Miller*, 219 Wis.2d 250, 260, 580 N.W.2d 233. A duty of care arises when the defendant has actual or constructive notice of a foreseeable risk of harm. *See Wallow v. Zupan*, 35 Wis.2d 195, 150 N.W.2d 329, 331 (1967); *see also Vogt v. S.M. Byrne Const. Co.*, 17 Wis.2d 96, 115 N.W.2d 485, 486 (1962) (standard to apply when negligence claim is based on a product).

For reasons discussed previously, Menges' negligence claim fails due to his inability to proved a causal connection between the defendant's conduct and his injury. The Court need not revisit this issue.

### Negligence Per Se

 Plaintiffs also argue that the Defendants' violations of FDA and other regulations constitutes negligence per se. Indeed, the bulk of the Plaintiffs' brief is devoted to discussion of the widespread marketing by Defendant of their device in contravention of federal law. Relying on *Cali*, 24 F.Supp.2d at 954, defendant argues that Wisconsin law precludes such a claim. This Court disagrees and finds the recent case of *Valente*, 48 F.Supp.2d 862, persuasive. In *Valente*, the Eastern District of Wisconsin specifically disagreed with the analysis in *Cali* and held that a plaintiff could assert a negligence *per se* claim based on alleged violations of the

FDCA. *Id.* at 954. *See also, Taylor*, 1998 WL 962062 (finding similarly). However, as was the case in *Valente*, even if negligence *per se* were established here, this Court must still determine whether such negligence 'was the proximate cause of the injury for which recovery is sought.' *Valente*, 48 F.Supp.2d 862, 873. Accepting Menges' claims that the Defendant violated federal law by its marketing of this device without FDA approval, Menges still has not produced medical evidence that the use of the Defendant's device is a proximate cause of his injury and pain. Thus, this claim fails.

### C. COUNT IV—BREACH OF IMPLIED WARRANTY

 In a claim based on implied warranty, there is a requirement of privity of contract. *City of La Crosse v. Schubert, Schroeder & Assoc., Inc.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976), *rev'd on other grounds by Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 573 N.W.2d 842 (1998). Privity of contract is the relationship that exists between two contracting parties. *Id.* at 41, 240 N.W.2d 124 72 Wis.2d 38, 240 N.W.2d 124. Here, the undisputed facts show that the plaintiffs never had a relationship, or any contact whatsoever, with Defendant or any person employed by or representing Defendant. *Compare T.W.M. and S.M. v. American Medical Systems, Inc.*, 886 F.Supp. 842, 844 (N.D.Fla.1995); *Baker*, 35 F.Supp.2d 875. Accordingly, summary judgment is proper as to this claim.

### D. COUNT V—FAILURE TO WARN

 Wisconsin, like most jurisdictions, recognizes a cause of action for a manufacturer's failure to warn of a danger associated with a product. *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 922–23 (1979). Failure-to-warn is a theory of recovery that is separate from a claim alleging defective design. *See Gorton v. American Cyanamid Co.*, 194 Wis.2d 203, 533 N.W.2d 746,

754 (1995). However, under the Learned Intermediary Doctrine, manufacturers of prescription medical products have a duty only to warn physicians, rather than patients, of the risks associated with the use of the product. *See Wheat,* 46 F.Supp.2d 1351, 1362; *Talley,* 7 F.Supp.2d 725, 730. As spinal fixation devices are "available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Talley, supra.* Furthermore, even if the manufacturer provides inadequate information, however, the manufacturer will not be liable if the plaintiff's physician independently knew of the risks and failed to advise the plaintiff. *Id.* Hence, a plaintiff must not only show that a manufacturer's warning was inadequate, but that such inadequacy affected the prescribing physician's use of the product and thereby injured the plaintiff. Menges has failed to make such a showing in this case. Accordingly, summary judgment is proper.

### E. COUNTS VI, VII, and IX— IMPROPER MARKETING

██ As to any claim of fraud or "fraud on the FDA," Menges must prove that he reasonably relied upon certain misrepresentations. Menges has failed to point to any evidence tending to show that Dr. Robbins relied on any misrepresentations made by Defendant or that Dr. Robbins ever heard any misleading statements made by representatives of Defendant. *Compare Valente,* 48 F.Supp.2d 862, 876; *Driggers v. Sofamor, S.N.C.,* 44 F.Supp.2d 760, 763 (M.D.N.C.1998); *Baker,* 35 F.Supp.2d 875, 878. Therefore, summary judgment is also appropriate as to this claim.

### F. COUNT X—EMOTIONAL DISTRESS

██ Menges claims that Defendant's reckless and outrageous conduct caused him to suffer emotional distress. As Wisconsin courts have recognized, "not all in-juries that occur in some way as a result of another's conduct are redressable in a court of law." Some injuries are so indirectly related to the conduct of a person that notwithstanding the fact that emotion distress is suffered, no recovery is permitted. *See O'Brien v. Medtronic, Inc.,* 149 Wis.2d 615, 439 N.W.2d 151 (1989); *Garrett v. City of New Berlin,* 122 Wis.2d 223, 362 N.W.2d 137 (1985). The *O'Brien* court stated that had the plaintiffs presented any evidence that the medical device was defective they would have had a cause of action under Wisconsin law. 149 Wis.2d 615, 439 N.W.2d 151, 153. The court noted that permitting recovery would propel it down the slippery slope of liability when the product was not defective. *Id.* Therefore the court refused to hold the manufacturer liable for what it believed were indirect injuries. Similarly, in this case, Menges has failed to provide sufficient evidence of medical causation or product defect. Therefore, his emotional distress claim also fails.

### CONCLUSION

For the preceding reasons Defendant, DePuy's Motion for Summary Judgment is **GRANTED** as to all remaining counts in Plaintiff's complaint and this cause is DISMISSED. Each party will bear its own costs. The clerk shall enter judgment accordingly.

IT IS SO ORDERED.